1  CHERYL D. ORR (SBN 143196)
   cheryl.orr@dbr.com
2  S. FEY EPLING (SBN 190025)
   fey.epling@dbr.com
3  DRINKER BIDDLE & REATH LLP
   50 Fremont Street, 20th Floor
4  San Francisco, CA  94105-2235
   Telephone:    (415) 591-7500
5  Facsimile:    (415) 591-7510

6  Attorneys for Defendants
   USM, INC. and ROSS STORES, INC.

7

8                 UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11

12 FEDERICO VILCHIZ VASQUEZ, JESUS       Case No. _____
   VILCHEZ VASQUEZ, FRANCISCO
13 DOMINGO CLAUDIO, for themselves       **DEFENDANTS' NOTICE OF REMOVAL**
   and all others similarly situated,    **TO THE UNITED STATES DISTRICT**
14                                        **COURT FOR THE NORTHERN**
                                          **DISTRICT OF CALIFORNIA**
15              Plaintiffs,

16        v.

17 USM, INC. and ROSS STORES, INC.,

18              Defendants.

19

20 **NOTICE TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE**

21 **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION:**

22

23     Defendants USM, Inc. and Ross Stores, Inc. (collectively the "Defendants"), by and

24 through undersigned counsel and pursuant to 28 U.S.C. §§ 1332, 1441, 1446 and 1453, hereby

25 give notice of the removal of this action from the Superior Court of California, Alameda County,

26 to the United States District Court for the Northern District of California, San Francisco Division.

27 In support thereof, Defendants aver as follows.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF REMOVAL TO FEDERAL COURT                          CASE NO. _____

# I.

## JURISDICTIONAL STATEMENT

1.     The Class Action Fairness Act of 2005 (CAFA), Pub. L. No. 109-2, 119 Stat. 4 (2005) grants federal courts diversity jurisdiction over putative class actions that have: (1) been commenced after February 18, 2005; (2) minimal diversity; (3) 100 or more class members; and (4) an aggregate amount in controversy in excess of $5,000,000. *See* 28 U.S.C. §§ 1332 note, 1332(d)(2)(A), 1332(d)(5)(B), 1332(d)(2).   This action satisfies every applicable jurisdictional prerequisite.

**A.     Commencement**

2.     CAFA applies to civil actions that are commenced after CAFA's effective date, *i.e.*, after February 18, 2005. *See* 28 U.S.C. § 1332 note.

3.     Plaintiffs Federico Vilchiz Vasquez, Jesus Vilchez Vasquez, and Francisco Domingo Claudio (collectively the "Plaintiffs") commenced this action on September 5, 2013 by filing a Complaint in the Superior Court of California, Alameda County, under the caption *Vasquez et al. v. USM, Inc. et al.*, No. RG13-694366. *See* Compl. (attached as part of Exhibit A).

4.     Accordingly, this action was commenced after February 18, 2005.

**B.     Minimal Diversity**

5.     CAFA requires only minimal diversity, i.e., that "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A); *see also Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1020, 1021 (9th Cir. 2007) ("[U]under CAFA, complete diversity is not required; 'minimal diversity' suffices.").

6.     Ross Stores, Inc. is a citizen of Delaware and California because it is organized under the laws of Delaware and has its principal place of business in California. *See* Compl. ¶ 25 ("Ross Stores, Inc., ... is headquartered at 4440 Rosewood Drive in Pleasanton, CA."); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010) ("We conclude that 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities.   It is the place that Courts of Appeals have called the corporation's 'nerve center.'   And in practice it should normally be the place where the corporation maintains

1    its headquarters.").

2         7.    USM, Inc. is a citizen of Pennsylvania because it is organized under the laws of

3    Pennsylvania and has its principal place of business in Pennsylvania. *See* Compl. ¶ 22 ("USM ...

4    is a for-profit corporation with its headquarters located at 1880 Markley, Norristown, PA

5    19401."); Declaration of Steven Ridge ¶ 4 ("USM is incorporated in Pennsylvania."); *id.* ¶ 5

6    ("USM's corporate headquarters are located at 1880 Markley Street, Norristown, Pennsylvania

7    19401.") (attached as Exhibit B).

8         8.    Plaintiffs allege that they are residents of California. *See* Compl. ¶ 19 ("Plaintiff

9    Domingo ... lives in Oakland, California."); *id.* ¶ 20 ("Plaintiff F. Vilchiz ... lives in Oakland,

10   California."); *id.* ¶ 21 ("Plaintiff J. Vilchez ... lives in Oakland, California.").

11        9.    Plaintiffs brings this putative interstate class action on behalf of "[a]ll persons who

12   were employed by a Sub to clean a Ross Dress for Less and/or dd's DISCOUNTS store in

13   California in connection with the performance of a subcontractor agreement with USM at any

14   time from four years prior to the date of filing of this action through the date of trial." *Id.* ¶ 98.

15        10.   The putative class is defined by reference to employees' place of employment

16   rather than their places of residence or domicile. *See Newman-Green, Inc. v. Alfonzo-Larrain*,

17   490 U.S. 826, 828 (1989) (discussing residence and domicile); *Kanter v. Warner-Lambert Co.*,

18   265 F.3d 853, 857 (9th Cir. 2001) (same). However, at least one of those California employees

19   must be domiciled in and thus a citizen of a state other than Pennsylvania.

20        11.   Accordingly, there is minimal diversity between at least one defendant (USM, a

21   citizen of Pennsylvania) and the named and unnamed members of the putative class (all located in

22   California and most certainly not all citizens of Pennsylvania). *See* 28 U.S.C. § 1332(d)(2)(A).[1]

23   **C.   Numerosity**

24        12.   CAFA does not apply to class actions "in which ... the number of members of all

---

26   [1]   Moreover, Ross Stores, Inc. intends to move to dismiss the claims against it pursuant to
27   Federal Rule of Civil Procedure 12(b)(6), after which there would be complete diversity.

1    proposed plaintiff classes in the aggregate is less than 100." 28 U.S.C. § 1332(d)(5)(B).

2        13.    Plaintiff defines the putative class as including of "[a]ll persons who were

3    employed by a Sub to clean a Ross Dress for Less and/or dd's DISCOUNTS store in California in

4    connection with the performance of a subcontractor agreement with USM at any time from four

5    years prior to the date of filing of this action through the date of trial." Compl. ¶ 98.

6        14.    Plaintiff alleges that the putative class is "so numerous that joinder of all Class

7    Members is impracticable." Compl. ¶ 100.

8        15.    In the four years prior to the filing of this action, no fewer than 600 persons were

9    employed by USM, Inc.'s subcontractors to clean Ross Dress for Less or dd's DISCOUNTS

10   stores in California. *See* Ridge Decl. ¶ 7 ("On average, over that time period, USM provided

11   janitorial services at approximately 300 Ross Dress for Less and dd's DISCOUNTS stores located

12   in California."); *id.* ¶ 10 ("In almost all instances, the daily cleaning of Ross Dress for Less and

13   dd's DISCOUNTS stores located in California required USM's subcontractors to assign two of

14   the subcontractor's employees to each store to perform that cleaning. Because this daily cleaning

15   had to be performed in the morning before the store opened to the public, in almost all instances a

16   separate crew had to be assigned to perform this task for each store….").

17       16.    Accordingly, there are more than 100 putative class members. *See* 28 U.S.C. §

18   1332(d)(5)(B).

19   **D.    Amount in Controversy**

20       17.    CAFA requires that "the matter in controversy exceeds the sum or value of

21   $5,000,000, exclusive of interest and costs…." 28 U.S.C. § 1332(d)(2).

22       18.    "[T]o determine whether the matter in controversy exceeds the sum or value of

23   $5,000,000," the "claims of the individual class members shall be aggregated." *Id.* § 1332(d)(6).

24       19.    Plaintiffs have asserted three causes of action: (1) violation of California Labor

25   Code § 2810; (2) violation of Labor Code § 2698, the Private Attorneys General Act ("PAGA");

26   and (3) violation of Business and Professions Code § 17200, *et seq. See* Compl. ¶¶ 106–125.

27   Plaintiffs have also requested an award of attorneys' fees and costs. *Id.*, Prayer for Relief ¶ 7.

28       20.    As discussed below, the preponderance of the evidence shows that Plaintiffs'

1 allegations place more than $5,000,000 in controversy.[2]

2   21. **Labor Code § 2810 Damages.**  Plaintiffs assert a claim under Labor Code § 2810,

3 which provides that "[a] person or entity shall not enter into a contract or agreement for labor or

4 services with a construction, farm labor, garment, janitorial, security guard, or warehouse

5 contractor, where the person or entity knows or should know that the contract or agreement does

6 not include funds sufficient to allow the contractor to comply with all applicable local, state, and

7 federal laws or regulations governing the labor or services to be provided."  Cal. Lab. Code §

8 2810(a) (West 2013).  It allows an employee "to recover the greater of all of his or her actual

9 damages or two hundred fifty dollars ($250) per employee per violation for an initial violation

10 and one thousand dollars ($1,000) per employee for each subsequent violation...."  *Id.* §

11 2810(g)(1).  For present purposes, Defendants have calculated the amount in controversy by

12 reference to three categories of alleged actual damages.[3]

13   a. **Unpaid Minimum Wages.**  Labor Code Section 1182.12 provides that,

14   "after January 1, 2008, the minimum wage for all industries shall be not

15   less than eight dollars ($8.00) per hour," and Section 1197 provides that

16   "payment of a less wage than the minimum so fixed is unlawful."  Cal.

17   Lab. Code §§ 1182.12; 1197 (West 2013).  Here, based on the size of a

18   crew servicing a store (2 employees),[4] the number of stores serviced in the

---

20 [2] When assessing whether an amount in controversy exceeds $5 million, courts within the
21 Ninth Circuit apply a preponderance of the evidence standard.  *See Rodriguez v. AT&T Mobility
Services LLC*, 728 F.3d 975, 977  (9th Cir. 2013); *see also* 28 U.S.C. § 1446(c)(2)(B) (codifying
22 preponderance of the evidence standard in cases in which the complaint seeks nonmonetary or
unspecified monetary relief).

23 [3] Plaintiffs allege as follows: "[a]s a result of the insufficient funds provided for in . . . the
agreements between USM and the Subs, the Subs have routinely failed to pay Plaintiffs and other
24 similarly-situated janitorial employees the minimum wage, their contracted rate, and/or overtime
premiums.  The Subs have also failed to provide Plaintiffs and other similarly-situated janitorial
25 employees with timely itemized statements accurately showing the total hours worked and
applicable hourly rates and have failed to provide them with adequate meal and rest breaks."
26 Compl. ¶ 10.

27 [4] *See* Ridge Decl. ¶ 10 ("In almost all instances, the daily cleaning of Ross Dress for Less
and dd's DISCOUNTS stores located in California required USM's subcontractors to assign two

(Continued)

48 months before September 2013 (275, 289, 304 and 312),[5] the number of days each store was open each year (362),[6] the number of hours per day per employee per store (3),[7] and the amount of minimum wage allegedly unpaid per hour ($2.15),[8] a claim for payment of allegedly unpaid minimum wages puts at least $5,510,364 in controversy.[9]

       **b.**    **Missed Meal Periods.** Based on the size of a crew servicing a store (2 employees), the number of stores serviced in the 48 months before September 2013 (275, 289, 304 and 312), a minimum number of allegedly missed meal periods per week (1),[10] the number of weeks open per year (52),[11] and the hourly minimum wage ($8.00),[12] a claim for allegedly

(Continued)

of the subcontractor's employees to each store to perform that cleaning.").

[5]    *See* Declaration of James Amplo ¶ 4 (analyzing USM data showing that USM provided services to 275 stores from September 2009 to September 2010, 289 stores from September 2010 to September 2011, 304 stores from September 2011 to September 2012, and 312 stores from September 2012 to September 2013) (attached as Exhibit C); *see also* Declaration of Lauren Mateo ¶ 4 ("I then provided a copy of that data subset to James Amplo . . . .") (attached as Exhibit D).

[6]    *See* Ridge Decl. ¶ 8 ("The janitorial services that USM provided to Ross Dress for Less and dd's DISCOUNTS stores located in California under the Master Services Agreement during the period September 5, 2009 through September 4, 2013, included the cleaning of those stores seven days a week and 362 days per year.").

[7]    *See* Compl. ¶ 58.

[8]    *See* Compl. ¶ 59.

[9]    (2 employees per store) x (1180 stores in four twelve month periods) x (362 working days per store) x (3 hours per day) x ($2.15 in alleged unpaid minimum wages per hour) = $5,510,364. Even if it were assumed based on Exhibit E attached to the Complaint that each employee only worked on average 2 hours per day, per store, the claim for allegedly unpaid minimum wages alone would put at least $3,673,576 in controversy.

[10] *See, e.g., Quintana v. Claire's Stores, Inc.*, No. 13-0368, 2013 WL 1736671, at *6 (N.D. Cal. Apr. 22, 2013) ("Defendants' estimates of one meal or rest break violation per week is an acceptable method to calculate possible damages for these claims.")

[11]   (362 days in service per year) / (days per week) = 52 weeks (rounded).

[12]   *See* Cal. Lab. Code §§ 1182.12; 1197 (West 2013); California Industrial Welfare Commission Order No. 5-2001, Section 11(B) (effective July 1, 2003) ("If an employer fails to provide an employee a meal period in accordance . . . with . . . this Order, the employer shall pay

(Continued)

1    missed meal periods puts at least $981,760 in controversy.[13]

2        **c.**    **Missed Rest Periods.**  Based on the size of a crew servicing a store (2

3    employees), the number of stores serviced in the 48 months before

4    September 2013 (275, 289, 304 and 312), a minimum number of allegedly

5    missed rest period per week (1), the number of weeks open per year (52),

6    and the hourly minimum wage ($8.00),[14] a claim for allegedly missed rest

7    periods puts at least $981,760 in controversy.[15]

8        22.    **PAGA Penalties.**  Plaintiffs seek recovery of all civil penalties available under

9    PAGA for alleged violations of the Labor Code. Compl. ¶ 125. PAGA permits the imposition of

10   a separate penalty per violation per employee. *See* Cal. Lab. Code § 2699(a); *id.* § 2699(f)(2); *see*

11   *also Schiller v. David's Bridal, Inc.*, No. 10–0616, 2010 WL 2793650, at *6 (E.D. Cal. July 14,

12   2010) ("Plaintiff maintains that while she may request that PAGA penalties be awarded as to each

13   cause of action, Defendant may not 'stack' the PAGA penalties for purposes of calculating the

14   amount in controversy. The Court disagrees. . . . For these reasons, the Court concludes that

15   Defendant may aggregate all alleged PAGA penalties asserted as to each cause of action for

16   purposes of establishing the amount in controversy.").  Although a percentage of PAGA penalties

17   are ultimately paid to the Labor and Workforce Development Agency ("LWDA"), the full

18   amount of the penalty is included in amount in controversy for purposes of CAFA. *See id.* at *8

19   ("[T]he question is not how much Plaintiff or the class will ultimately recover; the amount in

---

(Continued)

the employee one (1) hour of pay at the employee's regular rate of compensation for each
workday that the meal period is not provided.").

[13]   (2 employees per store) x (1180 stores in four twelve month periods) x (1 missed meal
period per week) x (52 weeks) x ($8.00 per hour) = $981,760.

[14]   *See* California Industrial Welfare Commission Order No. 5-2001, Section 12(B) (effective
July 1, 2003) ("If an employer fails to provide an employee a rest period in accordance with . . .
this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular
rate of compensation for each work day that the rest period is not provided.").

[15]   (2 employees per store) x (1180 stores in four twelve month periods) x (1 missed rest
period per week) x (52 weeks) x ($8.00 per hour) = $981,760.

1    controversy is calculated based upon the amount put into controversy by the complaint, regardless

2    of how the recovery is divided.... Thus, it makes little difference whether the LWDA shares in

3    the recovery—Plaintiff, by alleging PAGA penalties, has put 100% of the PAGA penalties in

4    controversy."); *Thomas v. AETNA Health of California, Inc.*, No. 2011 WL 2173715, at *15 n.8

5    (E.D. Cal. June 2, 2011) ("CAFA explicitly allows aggregation.... Therefore, even assuming that

6    PAGA claims are separate and distinct, they could be aggregated under CAFA in any case").

7    Here, Plaintiffs seek penalties for the following categories of alleged Labor Code violations:

8    **a.    Unpaid Minimum Wage Penalties.**  Labor Code Section 1197.1 creates

9    penalties of $100 for any "initial violation" and $250 for any "subsequent

10    violation" of the minimum wage provisions.  Here, based on the size of a

11    crew servicing a store (2 employees), the number of stores serviced in the

12    12 months before September 2013 (312), the number of pay periods in the

13    12 months before September 2013 (26),[16] and the minimum statutory

14    penalty ($100),[17] a claim for unpaid minimum wage penalties puts at least

15    $1,622,400 in controversy.[18]

16    **b.    Missed Meal Period Penalties.**  Labor Code Section 226.7 provides that

17    "[n]o employer shall require any employee to work during any meal or rest

18    period mandated by an applicable order of the Industrial Welfare

19    Commission."  Cal. Lab. Code § 226.7(a) (West 2013).  Labor Code

20    Section 558 creates penalties is $50 for a first violation and $100 for any

21    subsequent violation of the meal break provisions. Cal. Lab. Code § 558(a)

---

[16]    *See, e.g., Quintana v. Claire's Stores, Inc.*, No. 13-0368, 2013 WL 1736671, at *6 (N.D. Cal. Apr. 22, 2013) ("Defendants' estimates of one meal or rest break violation per week is an acceptable method to calculate possible damages for these claims."); *Jasso v. Money Mart Exp., Inc.*, 11-5500, 2012 WL 699465, at *5 (N.D. Cal. Mar. 1, 2012) ("one violation per week on each claimed basis is a sensible reading of the alleged amount in controversy . . . .").

[17]    *See* Cal. Lab. Code § 2699(f)(2) (West 2013).

[18]    (2 employees per store) x (312 stores during one twelve month period) x (26 pay periods) x ($100 minimum statutory penalty per pay period) = $1,622,400.

(West 2013).   Here, based on the size of a crew servicing a store (2 employees), the number of stores serviced in the 12 months before September 2013 (312), the number of pay periods in the 12 months before September 2013 (26), and the minimum statutory penalty ($50), a claim for meal period penalties puts at least $811,200 in controversy.[19]

    c.    **Missed Rest Period Penalties.**  Labor Code Section 558 creates penalties is $50 for a first violation and $100 for any subsequent violation of the rest break provisions contained in California Industrial Welfare Commission Order No. 5-2001, Section 12(B) (effective July 1, 2003).  Here, based on the size of a crew servicing a store (2 employees), the number of stores serviced in the 12 months before September 2013 (312), the number of pay periods in the 12 months before September 2013 (26), and the minimum statutory penalty ($50), a claim for rest period penalties puts at least $811,200 in controversy.[20]

    d.    **Wage Statement Penalties.**  Labor Code Section 226.3 requires that employers give employees complete and accurate wage statements, and provides for a $250 penalty for an "initial citation" and a $1,000 penalty for any "subsequent citation."  Cal. Lab. Code § 226.3) (West 2013).  Here, based on the size of a crew servicing a store (2 employees), the number of stores serviced in the 12 months before September 2013 (312), the number of pay periods in the 12 months before September 2013 (26), and the minimum statutory penalty ($250),[21] a claim for wage statement penalties

---

[19]    (2 employees per store) x (312 stores during one twelve month period) x (26 pay periods) x ($50 minimum statutory penalty per pay period) = $811,200.

[20]    (2 employees per store) x (312 stores during one twelve month period) x (26 pay periods) x ($50 minimum statutory penalty per pay period) = $811,200.

[21]    *See* Cal. Lab. Code § 226.3 (West 2013).

1    puts at least $4,056,000 in controversy.[22]

2        **e.**   **PAGA Late Final Pay Penalties.**  Labor Code Section 201 provides that,

3    "[i]f an employer discharges an employee, the wages earned and unpaid at

4    the time of discharge are due and payable immediately."  Cal. Lab. Code §

5    201(a) (West 2013).  Section 202 provides that "[i]f an employee not

6    having a written contract for a definite period quits his or her employment,

7    his or her wages shall become due and payable not later than 72 hours

8    thereafter, unless the employee has given 72 hours previous notice of his or

9    her intention to quit, in which case the employee is entitled to his or her

10   wages at the time of quitting."  Cal. Lab. Code § 202(a) (West 2013).  And

11   Section 203 provides that, "[i]f an employer willfully fails to pay, without

12   abatement or reduction, in accordance with Sections 201, 201.3, 201.5,

13   202, and 205.5, any wages of an employee who is discharged or who quits,

14   the wages of the employee shall continue as a penalty from the due date

15   thereof at the same rate until paid or until an action therefor is commenced;

16   but the wages shall not continue for more than 30 days."  Cal. Lab. Code §

17   203(a) (West 2013).   Because Defendants do not currently knows the

18   number of employees who may have been discharged, for present purposes

19   Defendants have calculated the amount in controversy under CAFA

20   without reference to these penalties.

21      23.   **Restitution under Business & Professions Code § 17100.**  Plaintiffs also assert a

22   claim for violation of Business and Professions Code § 17200 and seek an award of restitution.

23   Because this relief appears to be duplicative of the other relief requested above, for present

24   purposes Defendants have calculated the amount in controversy without reference to this claim.

---

26   [22]    (2 employees per store) x (312 stores during one twelve month period) x (26 pay periods)
27   x ($250 minimum statutory penalty per pay period) = $4,056,000.

24. **Attorneys' Fees.** Plaintiffs also seek an award of attorneys' fees and costs. *See* Compl., Prayer for Relief ¶ 7. Awards of attorneys' fees and costs may be included in the amount in controversy. *See, e.g., Guglielmo v. McKee Foods Corp.*, 506 F.3d 696, 698 (9th Cir. 2007); *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) ("[W]here an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy."). A fee award in a certified class action can often amount to as much as thirty percent (30%) of a class's recovery, which could increase the amount in controversy by 30% or, put another way, to 130% of the class's claimed recovery. *See, e.g., Frederico v. Home Depot*, 507 F.3d 188, 199 (3d Cir. 2007) (citing cases); *Jasso v. Money Mart Exp., Inc.*, No. 11-5500 YGR, 2012 WL 699465, at *7 (N.D. Cal. Mar. 1, 2012) (stating that fee award of 25% of class recover was "not unreasonable").

25. **Total Amount in Controversy**. Based on the foregoing, the preponderance of the evidence shows that the Complaint places more than $17,000,000 in controversy. Specifically, the following types and amounts of damages and penalties have been placed in controversy:

| | |
|---|---|
| Unpaid Minimum Wage Damages | $5,510,364 |
| Missed Meal Period Damages | $981,760 |
| Missed Break Period Damages | $981,760 |
| Unpaid Minimum Wage Penalties | $1,622,400 |
| Missed Meal Period Penalties | $811,200 |
| Missed Rest Period Penalties | $811,200 |
| Wage Statement Penalties | $4,056,000 |
| **Damages and Penalties Subtotal** | **$12,937,896** |
| Attorneys' Fee Award[23] | $4,269,506 |
| **TOTAL AMOUNT IN CONTROVERSY** | **$17,207,402** |

[23] ($12,937,896 Damages and Penalties Subtotal) x (30% due to request for fee award) = (amount of attorneys' fees in controversy) = $4,269,506.

26.     The amount in controversy would increase if it included alleged damages that accrue after the date of this Notice of Removal.  *See* Compl. ¶ 98 (defining class as including people who perform work "through the date of trial"); *see also, e.g., Lao v. Wickes Furniture Co.*, 455 F. Supp.2d 1045, 1050 (C.D. Cal. 2006) (including "future damages" in amount in controversy because class period continued from date of filing to date of certification); *The Home Depot v. Rickher*, No. 06-8006, 2006 WL 1727749, at *2 (7th Cir. May 22, 2006) (including future effects of injunction in calculation of amount in controversy).

27.     Although Defendants deny that they have any liability to Plaintiffs or anyone else, and deny that the putative class could be properly certified under Federal Rule of Civil Procedure 23, the aggregate amount placed "in controversy" by the Complaint—that is, the aggregate value of all damages and fees sought and the costs of complying with all equitable relief sought— exceeds $5,000,000.  *See* 28 U.S.C. § 1332(d)(6) ("In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.").

28.     Because this is a putative class action that was commenced after February 18, 2005 in which there is minimal diversity, more than 100 putative class members, and more than $5,000,000 in the aggregate in controversy, this Court has original subject matter jurisdiction. *See* 28 U.S.C. § 1332(d)(2)(A).

29.     Because this action states a basis for original subject matter jurisdiction under 28 U.S.C. § 1332, it is removable pursuant to 28 U.S.C. § 1441(a).

## II.

## PROCEDURAL STATEMENT

### A.     Timeliness

30.     Pursuant to 28 U.S.C. 1446(b) and Federal Rule of Civil Procedure 6, this Notice of Removal has been timely filed within thirty (30) days of service because Defendants accepted service on October 24, 2013.  *See Murphy Bros, Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 351-52 (1999); *see also* C.C.P. § 415.30(c) ("Service of a summons pursuant to this section is deemed complete on the date a written acknowledgement of receipt of summons is executed, if

1  such acknowledgement thereafter is returned to the sender."); Pl.'s First Complex Case

2  Management Statement at 2:20-21 ("Defendants accepted service of the Summons and First

3  Amended Complaint on October 24, 2013.") (attached as part of Exhibit A).

**B.**   <u>**Defendants**</u>

4

5       31.   Pursuant to 28 U.S.C. § 1453(b), a putative class action may be removed "without

6  regard to whether any defendant is a citizen of the State in which the action is brought."

7  **C.**   <u>**Consent**</u>

8       32.   Pursuant to 28 U.S.C. § 1453(b), it is not necessary to obtain the consent of all

9  Defendants in order to remove a putative class action.  Nevertheless, all Defendants join in and

10  consent to this removal.

11  **D.**   <u>**Venue**</u>

12       33.   Pursuant to 28 U.S.C. § 1441(a), removal to the United States District Court for

13  the Northern District of California, San Francisco Division, is proper because that District and

14  Division embrace the Superior Court of California, Alameda County, where this action is now

15  pending. *See* 28 U.S.C. § 84(a).

16  **E.**   <u>**Assignment**</u>

17       34.   Because this action arises in Alameda County, it should be assigned to either the

18  San Francisco Division or the Oakland Division. *See* Civil L.R. 3-2(d).

19  **F.**   <u>**Attachments**</u>

20       35.   Pursuant to 28 U.S.C. § 1446(a), true and correct copies of Plaintiffs' Complaint

21  and all other process, pleadings and orders that Plaintiffs purportedly served on Defendants as of

22  the date of this Notice of Removal are attached collectively as Exhibit A.

23  **G.**   <u>**Notices**</u>

24       36.   Pursuant to 28 U.S.C. § 1446(d), Defendants will promptly file a copy of this

25  Notice of Removal in the Superior Court of California, Alameda County and give written notice

26  of the removal of this action to counsel for Plaintiffs.

27  **H.**   <u>**Defenses**</u>

28       37.   By removing this action to this Court, Defendants do not concede that they have

1 any liability, let alone liability of greater than $5,000,000, to the members of the putative class.

2 *See, e.g., Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005) ("[The

3 defendant] did not have to confess liability in order to show that the controversy exceeds the

4 threshold").   Rather, "[t]he amount in controversy is simply an estimate of the total amount in

5 dispute, not a prospective assessment of defendant's liability." *Lewis v. Verizon Comm'ns, Inc.*,

6 627 F.3d 395, 400 (9th Cir. 2010) (citing cases); *see also, e.g., Pretka v. Kolter City Plaza II, Inc.*,

7 608 F.3d 744, 751 (11th Cir.2010) ("[T]he plaintiffs' likelihood of success on the merits is largely

8 irrelevant to the court's jurisdiction because the pertinent question is what is *in controversy* in the

9 case, not how much the plaintiffs are ultimately likely to recover.") (emphasis in original)

10 (quotations omitted); *Heejin Lim v. Helio, LLC*, No. 11-9183, 2012 WL 359304, at *3 (C.D. Cal.

11 Feb. 2, 2012) ("Defendants effectively would be required to concede liability were the Court to

12 require a stronger showing . . . ."); *Bryan v. Wal-Mart Stores, Inc.*, No. 08-5221, 2009 WL

13 440485, at *3 (N.D. Cal. Feb. 23, 2009) (same); *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp.

14 2d 1199, 1204–05 (E.D. Cal. 2008) (finding that defendant need not "research, state, and prove

15 the plaintiff's claims" in order to remove action) (quotations omitted); *Helm v. Alderwoods Grp.,*

16 *Inc.*, No. 08-1184, 2008 WL 2002511, at *5 (N.D. Cal. May 7, 2008) ("[D]efendants cannot be

17 expected to try the case themselves for purposes of establishing jurisdiction, and then admit to the

18 opposing party and to the Court that a certain number of … violations did indeed occur."); *Rippee*

19 *v. Boston Mkt. Corp.*, 408 F. Supp. 2d 982, 986 (S.D. Cal. 2005) (focus is on what is "in

20 controversy," not what defendant "would owe"); *Muniz v. Pilot Travel Ctrs. LLC*, No. 07-0325,

21 2007 WL 1302504, at *2 (E.D. Cal. May 1, 2007) (defendant need not "prove the plaintiff's

22 claims for damages" and assuming 100% violation rate when calculating amount in controversy).

23  38. By removing this action to this Court, Defendants do not waive any defenses,

24 objections or motions available to them under state or federal law.  Defendants expressly reserve

25 the right to move for judgment in favor of Defendants pursuant to Rules 12 and 56 of the Federal

26 Rules of Civil Procedure, and to strike or oppose the certification of any putative class pursuant to

27 Federal Rule of Civil Procedure 23.

28  **WHEREFORE**, Defendants respectfully remove this action from the Superior Court of

1 | California, Alameda County, to this court pursuant to 28 U.S.C. §§ 1332, 1441, 1446 and 1453.

2

3 | Dated: November 22, 2013            DRINKER BIDDLE & REATH LLP

4

5 | By: _____

6 |    Cheryl D. Orr

7 | Attorneys for Defendants
    USM, INC. and ROSS STORES, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Case3:13-cv-05448-WHA Document1 Filed1/22/13 Page17 of 53

*11874368*

1 | Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
2 | Katrina L. Eiland (SBN 275701)
keiland@gbdhlegal.com
3 | GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
4 | Oakland, CA  94612
Tel:  (510) 763-9800
5 | Fax:  (510) 835-1417

6 | Jonathan E. Gertler (SBN 111531)
Christian Schreiber (SBN 245597)
7 | CHAVEZ & GERTLER LLP
42 Miller Avenue
8 | Mill Valley, CA  94941
Tel:  (415) 381-5599
9 | Fax: (415) 381-5572

10 | Attorneys for Plaintiffs

11 | (additional attorneys listed on next page)



FILED
ALAMEDA COUNTY

SEP 0 5 2013

CLERK OF THE SUPERIOR COURT
By_____
Deputy

12 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

13 | IN AND FOR THE COUNTY OF ALAMEDA

14 | (UNLIMITED JURISDICTION)

**RG13 694366**

15 | FEDERICO VILCHIZ VASQUEZ, JESUS VILCHEZ VASQUEZ, FRANCISCO DOMINGO
16 | CLAUDIO, for themselves and all others similarly situated,
17 |
      Plaintiffs,
18 | vs.
19 | USM, INC. dba USM SERVICES, INC., a Pennsylvania Corporation; Ross Stores, Inc.
20 | dba Ross Dress for Less, a Delaware Corporation; Ross Stores, Inc. dba dd's DISCOUNTS, a
21 | Delaware Corporation; and DOES 1 through 20, inclusive,
22 |
      Defendants.
23 |

Case No.:

**COMPLAINT; CLASS AND REPRESENTATIVE ACTION [CAL. CODE CIV. PROC. § 382]**

**(1)  VIOLATION OF CAL. LAB. CODE § 2810**
**(2)  UNLAWFUL AND/OR UNFAIR BUSINESS PRACTICES (BUS. & PROF. CODE §§ 17200-17208);**
**(3)  PAGA CLAIM FOR CIVIL PENALTIES (LABOR CODE § 2698 *et seq.*); and,**
**(4)  REASONABLE ATTORNEYS' FEES AND COSTS**

<u>DEMAND FOR JURY TRIAL</u>

24 |
25 |
26 |
27 |
28 |

493228.3

COMPLAINT

Paul Cohen (SBN 148371)
Joanna Shalleck-Klein (SBN 275686)
Daniel R. Weltin, Of Counsel (SBN 226600)
LEGAL AID OF MARIN
30 North San Pedro Road, Ste. 220
San Rafael, CA 94906
Tel: (415) 492-0230
Fax: (415) 492-0947

Juliet M. Brodie (SBN 248989)
STANFORD COMMUNITY LAW CLINIC
2117 University Avenue
East Palo Alto, CA 94303
Tel: (650) 725-9200
Fax: (650) 326-4162

COMPLAINT

493228.3

Plaintiffs Federico Vilchiz Vasquez ("Plaintiff F. Vilchiz"), Jesus Vilchez Vasquez ("Plaintiff J. Vilchez"), and Francisco Domingo Claudio ("Plaintiff Domingo") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

## INTRODUCTION

1.     Plaintiffs were employed by local subcontractors to clean Ross Dress for Less and/or dd's DISCOUNTS stores in California in connection with the performance of contracts or agreements for janitorial services and labor between (a) Defendant Ross Stores, Inc. ("Ross"), which operates the Ross Dress for Less and dd's DISCOUNTS "off-price" stores, and prime contractor defendant USM, Inc. dba USM Services, Inc. ("USM"); and (b) prime contractor USM and local subcontractors. Plaintiffs bring this case as a class action against USM and Ross under California Code of Civil Procedure § 382 on behalf of themselves and all other janitorial workers who have cleaned a Ross Dress for Less and/or dd's DISCOUNTS store in the State of California, at any time from four years prior to the date of filing of this action through the date of trial, in connection with the performance of subcontractor agreements for janitorial services with USM for violations of: 1) California Labor Code § 2810; 2) the California Unfair Competition Law ("UCL"), codified as California Business and Professions Code § 17200-17208; and 3) the Private Attorneys General Act of 2004 ("PAGA"), codified as California Labor Code § 2698 *et seq.*

2.     Plaintiffs allege that USM and Ross have engaged in a janitorial services subcontracting scheme that results in significant cost-savings to Ross and substantial profits to prime contractor USM, while depriving the janitorial workers who clean Ross Dress for Less and/or dd's DISCOUNTS stores in connection with the performance of subcontractor agreements with USM of the wages to which they are entitled under California law.[1]

---

[1] As the Los Angeles Times recently reported about the findings of a recent report entitled *Hollow Victories: The Crisis in Collecting Unpaid Wages for California's Workers*, by the National Employment Law Project and the UCLA Labor Center, subcontracting schemes such as the one in which USM has engaged often leave injured employees with no means to recover their unpaid wages. *See* Marc Lifsher, *Many Low-Wage Workers Who Won Judgments Were Never Paid*, L.A. TIMES, June 27, 2013.  Many janitorial employees like Plaintiffs work for small, undercapitalized subcontractors that do not have the funds to pay their employees the wages they are owed, even when employees secure judgments against them.  The Times reported that, "[o]ver a recent three-year period, thousands of mainly immigrant workers in California who clean buildings . . . won monetary judgments against their employers but were never paid." *Id.* This inability to collect judgments for

3.     Under this scheme, Ross contracts with USM to provide janitorial services for some or all of its Ross Dress for Less and dd's DISCOUNTS store locations around California.  In turn, USM subcontracts with janitorial subcontractors (the "Subs") that hire the workers necessary to perform the janitorial services USM contracts to provide at the designated retail store locations.

4.     On information and belief, the agreements between Ross and USM outline in detail what stores are to be cleaned, what janitorial services should be performed at these stores, how often these services should be completed, how many workers are required, when the workers should be present at the stores, how the work will be monitored, and how much Ross will pay USM.  These agreements further recognize that USM will subcontract with local janitorial businesses that will supply the labor.

5.     The agreement(s) that USM and Ross sign do not include funds sufficient to allow USM to comply with all applicable local, state, and federal laws or regulations governing the janitorial services to be provided at Ross Dress for Less and/or dd's DISCOUNTS stores in connection with the performance of those agreement(s).

6.     Ross knows or should know that the funds provided to USM under their agreement(s) are not sufficient to allow USM to comply with all applicable local, state, and federal laws or regulations governing the janitorial services to be provided at Ross Dress for Less and/or dd's DISCOUNTS stores in connection with the performance of those agreement(s).

7.     The subcontractor agreements that USM signs with the Subs for the performance of janitorial services at Ross Dress for Less and/or dd's DISCOUNTS stores in connection with the performance of the agreements(s) it signs with Ross are form contracts drafted by USM.  These contracts provide, in relevant part, that 1) USM will not pay the Subs until 30 days after it receives all

---

unpaid wages is in part because the "companies representing three-fifths of unpaid-wage judgments legally vanished."  *Id.*  As the article explained, the "[b]usinesses are dissolved, licenses canceled, and it's very hard for workers to get their money."  *Id.*  Meanwhile, prime contractors like USM, who knowingly underfund these janitorial subcontracts, continue to profit from the employees' labor.  This is precisely the type of scheme that Labor Code § 2810 was enacted to stop.  *See* Senate Committee Bill Analysis of SB 179 ("This measure attacks the hidden use of unfair economic leverage to influence labor contractors to enter into contracts that are financially inadequate to permit the contractor to comply with applicable laws. While employers usually claim they are unaware of abuses committed by their contractors, the reality is just the opposite.").

1 | Work Orders signed by a retail store representative; 2) USM will not pay the Subs unless the retail

2 | store is satisfied with the janitorial services rendered; 3) the Subs must maintain worker's

3 | compensation, general liability, and automotive insurance; and 4) USM unilaterally reserves the right

4 | to discount payments to Subs for services performed if the Subs request accelerated payment or if the

5 | Subs reach a certain volume of payments from USM in a given year.

6 |      8.     USM's subcontractor agreements with the Subs also dictate the specific requirements

7 | for the janitorial services to be performed by the Subs at Ross Dress for Less and/or dd's DISCOUNTS

8 | stores, including which retail stores are to be cleaned, the type work to be performed, the number of

9 | hours per week that must be spent performing the janitorial services, and the amount that USM will

10 | pay the Subs for completing the services detailed in the agreement. The subcontractor agreements that

11 | USM and the Subs sign do not include funds sufficient to allow the Subs to cover their operating

12 | budgets, which include the insurance required by the subcontractor agreements and the wages that

13 | Plaintiffs and other employees of the Subs earn by performing the janitorial services detailed in the

14 | subcontractor agreements.

15 |      9.     USM knows or should know that the subcontractor agreements for janitorial services

16 | that USM enters into with the Subs do not include funds sufficient to allow the Subs to comply with all

17 | applicable local, state, and federal laws or regulations governing the janitorial services to be provided

18 | in violation of California Labor Code § 2810.

19 |      10.     As a result of the insufficient funds provided for in both the agreement(s) between Ross

20 | and USM and the agreements between USM and the Subs, the Subs have routinely failed to pay

21 | Plaintiffs and other similarly-situated janitorial employees the minimum wage, their contracted rate,

22 | and/or overtime premiums. The Subs have also failed to provide Plaintiffs and other similarly-situated

23 | janitorial employees with timely itemized statements accurately showing total hours worked and

24 | applicable hourly rates and have failed to provide them with adequate meal and rest breaks.

25 | **JURISDICTION AND VENUE**

26 |      11.     This Court has jurisdiction over Plaintiffs' and Class Members' claims for damages and

27 | injunctive relief under California Labor Code § 2810.

28 |

493228.3

12. This Court has jurisdiction over Plaintiffs' and Class Members' claims for restitution of unpaid wages and other ill-gotten benefits arising from Defendants' unlawful and/or unfair business practices, and injunctive relief under Business & Professions Code §§ 17202 and 17203.

13. This Court has jurisdiction over Plaintiffs' and Class Members' PAGA claims for civil penalties under California Labor Code § 2698 *et seq.*

14. The Court has jurisdiction over USM because USM transacts business within the State of California.

15. The Court has jurisdiction over Ross because Ross transacts business within the State of California.

16. Further, a substantial part of the acts and omissions giving rise to the injuries sustained by Plaintiffs and Class Members occurred in Alameda County.

17. Venue is proper in this Court, as both USM and Ross maintain offices, transact business, and/or have an agent in Alameda County, and USM and Ross are otherwise within this Court's jurisdiction for purposes of service of process. Both Ross and USM have entered into insufficiently funded agreements to clean Ross Dress for Less and/or dd's DISCOUNTS stores in Alameda County and other counties in California, which have harmed Plaintiffs and Class Members.

18. Ross is incorporated in Delaware and is headquartered in Pleasanton, Alameda County, California.

## THE PARTIES

**Plaintiffs**

19. Plaintiff Domingo, a native Spanish speaker, lives in Oakland, California. In or around October 2010, RC Maintenance, Inc., an Alameda County based janitorial subcontractor, hired Plaintiff Domingo to provide janitorial services to, among other stores, a Ross Dress for Less store in Alameda County, in connection with the performance of a Subcontractor Agreement with USM. Mr. Domingo continued working for RC Maintenance performing janitorial services in connection with the performance of a subcontractor agreement with USM through approximately October 2012.

20. Plaintiff F. Vilchiz, a native Spanish speaker, lives in Oakland, California. In or around February 2012, New Generation Maintenance, an unregistered Alameda County based janitorial subcontractor, hired Plaintiff F. Vilchiz to provide janitorial services to the Ross Dress for Less store located at 4408 Las Positas Road in Livermore, California, in connection with the performance of a subcontractor agreement with USM. Plaintiff F. Vilchiz worked for New Generation Maintenance performing janitorial services in connection with the performance of a subcontractor agreement with USM until approximately October 2012.

21. Plaintiff J. Vilchez, a native Spanish speaker, lives in Oakland, California. In or around May 2012, New Generation Maintenance, an unregistered Alameda County based janitorial subcontractor, hired Plaintiff J. Vilchez to provide janitorial services to the Ross Dress for Less store located at 4408 Las Positas Road in Livermore, California, in connection with the performance of a Subcontractor Agreement with USM. Plaintiff F. Vilchiz worked for New Generation Maintenance performing janitorial services in connection with the performance of a subcontractor agreement with USM until approximately October 2012.

**Defendants**

22. USM, which boasts estimated 2013 revenues of $6.5 billion, is a for-profit corporation with its headquarters located at 1880 Markley Street, Norristown, PA 19401.

23. In May 2011, USM, Inc., listing an address of 1880 Markley Street, Norristown, PA 19401, registered with the California Secretary of State to do business in California as USM Services, Inc.

24. On or around June 30, 2011, Fortune 500 company EMCOR Group, Inc., a Delaware corporation headquartered in Norwalk, CT, announced that it had completed its acquisition of USM Services Holdings, Inc. for $255 million in cash, representing $225 million for the base USM business plus $30 million for the net present value of a USM tax benefit.

25. Ross Stores, Inc., which operates two brands of "off-price" stores – Ross Dress for Less and dd's DISCOUNTS – is headquartered at 4440 Rosewood Drive in Pleasanton, CA. According to its 2012 Annual Report and Form 10-K for the fiscal year ended February 2013, Ross ended the year

493228.3

with 1,199 stores in 33 states, the District of Columbia, and Guam; $9.7 billion in total sales, up from $8.6 billion in sales for the 52 weeks ended January 28, 2012; and a 20% increase in net earnings to $786.8 million, up from $657.2 million in 2011.

26. The true names and capacities of DOES 1-20, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs, who therefore sue such defendants by fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiffs will amend this Complaint to show the true names, capacities, and involvement of DOES 1-20, inclusive, once they are ascertained. Plaintiffs are informed, believe, and thereon allege that each of the defendants designated as a DOE is responsible in some manner for the events, happenings, and omissions described herein, and that Plaintiffs' injuries and damages were proximately caused by said defendants. Plaintiffs are informed, believe, and thereon allege that at all times herein mentioned, each of the DOES 1-20, inclusive, was an agent, employee, successor, predecessor, parent, and/or subsidiary of each of the remaining defendants, and each of them, was at all times acting within the purpose and scope of the applicable relationship.

## FACTUAL ALLEGATIONS

27. Prime contractor USM provides janitorial services to hundreds of retail chains stores around the country by subcontracting with a network of "local contractors."[2] Throughout California, these small, unsophisticated, often-unregistered janitorial subcontracting businesses are run mainly by immigrants and low-wage workers and rarely operate for longer than a year or two. These Subs, in turn, hire predominately immigrant workers, many of whom are monolingual Spanish speakers with limited education and job opportunities, to perform the cleaning services that the Subs subcontract with USM to complete.

28. The Subs routinely receive insufficient funds from USM to maintain their businesses and compensate their workers in compliance with the law. Accordingly, the Subs fail to pay their employees the wages they have earned, violate the Labor Code and, eventually, close down shop.

---

[2] USM, Contractor Opportunities in Facilities Maintenance, HBAV Services & Electrical Construction, *www.usmservices.com/services/janitorial-floor-care* (last checked May 2, 2013).

493228.3

29.     To promote maximum cost-savings, Ross contracts with USM for the provision of janitorial services at its Ross Dress for Less and dd's DISCOUNTS stores throughout California, knowing that, due to the insufficiency of the funds provided for in the contract(s) between Ross and USM, USM will in turn enter into thinly funded agreements with Subs that do not allow the Subs to comply with all applicable local, state, and federal laws or regulations governing the labor or services to be provided.

30.     Plaintiff Domingo, who worked for Alameda County based Sub RC Maintenance, Inc.("RC Maintenance") beginning in or around late 2009, providing janitorial services to various Oakland retail stores including a Ross Dress for Less store in Alameda County, received no premium wages for his overtime hours and regularly could not cash his paycheck because of insufficient funds. When RC Maintenance informed Plaintiff Domingo in or around early January 2012 that it lacked the money to pay him for work he had performed since mid-November 2011, Plaintiff Domingo resigned. Soon thereafter, two years after registering with the California Secretary of State, RC Maintenance went out of business.  RC Maintenance's owner, Carlos Rivera, reported that his company went out of business, in large part, because of the insufficient funds provided by the Subcontractor Agreements between USM and RC Maintenance.[3]

31.     In the wake of RC Maintenance, New Generation Maintenance ("New Generation") began operating in Oakland, and USM engaged the business, despite its never registering with the County or the State.[4]  New Generation hired Plaintiff F. Vilchiz to clean a Ross Dress for Less store in Livermore, California, in connection with the performance of its Subcontractor Agreement with USM. Plaintiff F. Vilchiz began working for New Generation in or around February 2012.  He received no compensation for his first month of work, after which New Generation began providing him with a lump sum cash or check payment after each month of work.

---

[3] RC Maintenance filed with the Secretary of State on January 27, 2009 as Entity No. C3179591, registering an Entity Address of 3235 MacArthur Blvd., Oakland, CA  94602.  RC Maintenance is now on suspended status with the California Secretary of State.

[4] New Generation's address was 1248 35th Avenue, Oakland, CA 94601.

493228.3

32.     In or around May 2012, New Generation hired Plaintiff J. Vilchez to work at the same Livermore Ross Dress for Less store.  Plaintiff J. Vilchez also received no wages for his first month of work but continued to work for New Generation and received lump sum cash or check payments after completing subsequent months of work.

33.     In or around early October 2012, New Generation informed Plaintiffs F. Vilchiz and J. Vilchez that it lacked the funds to pay them for their previous month's work, so the men resigned.  On information and belief, New Generation has since ceased operations.

34.     Bearing in mind the requirements and payments outlined in its agreement(s) with Ross, USM dictated the terms of its Subcontractor Agreements with both RC Maintenance and New Generation—including the janitorial services to be performed at each store location, the hours of labor required to complete the contracted-for services, and the amount that the Sub would be paid for these services.

35.     However, as Ross knew or should have known would be the result of its insufficiently funded agreement(s) with USM, the amount that USM agreed to pay the Subs was insufficient to comply with all applicable laws and the costs required to complete the janitorial services that the Subcontractor Agreements required the Subs to perform.

36.     In addition, USM reduced its promised payments to the Subs even after the work had been performed.

37.     Since at least 2008, Ross and USM have conspired to systematically engage local janitorial subcontractors to clean Ross Dress or Less and/or dd's DISCOUNTS stores throughout California, while imposing upon these Subs contractual arrangements that they know or should know do "not include funds sufficient to allow the [Subs] to comply with all applicable local, state, and federal laws or regulations governing the labor or services to be provided," in violation of Labor Code § 2810.

**Ross and USM Establish Services**

38.     On information and belief, the agreement(s) between USM and Ross outline in detail what Ross Dress for Less and/or dd's DISCOUNTS stores are to be cleaned, what janitorial services

8

COMPLAINT

should be performed at these stores, how often these services should be completed, how many workers are required, when the workers should be present at the stores, how the work will be monitored, and how much Ross will pay USM. These agreements further recognize that USM will not hire the workers directly but will instead subcontract with local businesses that will supply the labor.

39. The janitorial services for which Ross contracts with USM generally fall into two categories: (1) daily or regular basic cleaning and (2) periodic floor scrubbing, recoating, and buffing, an overnight process that the janitors call "floor stripping." Often, the janitors complete the basic cleaning service under the supervision of a store manager during the 2-3 hours either before a store opens or after it closes. In addition, each store receives a floor buffing, scrubbing and recoating service about once a month. The workers who complete this floor polishing are often locked into a store overnight without supervision.

40. To ensure that the Subs provide the correct services, USM and Ross memorialize the requirements for each service in various documents that USM provides to the Subs, including manuals, instruction sheets, and PowerPoint presentations.[5]

41. As these documents reflect, since at least 2008, the basic cleaning Ross and USM have required the Subs to provide on a daily or regular basis has been standardized and specific: sweeping and mopping of tiled areas; cleaning of mirrors and front door glass; vacuuming of mats and carpets; cleaning of all counters; emptying of all wastebaskets; cleaning and sanitizing of all fixtures; refilling of dispensers and cleaning of sinks, stalls, and toilets in the bathroom; cleaning of all mirrors; dusting of all partitions; washing of windows; wiping down of fittings rooms; and dusting signs, art and vents.

42. Likewise, USM and Ross have developed standard practices for how and when the floor buffing, scrubbing, and recoating should occur and what rules the workers must follow when in the stores overnight, including such details as the type of finish the workers should use and the number of coats that should be applied, and a clear mandate that workers "must not exit the Store for any reason

---

[5] For instance, USM Senior Director Jimmy Henley and Ross Contract Services Manager Ryan Benguerel produced and dispensed a PowerPoint presentation on or around October 28, 2008, that outlined the janitorial services that should be completed every day in/on the sales floor, the customer service area, the restrooms, the fitting rooms, the outside of the building, the lounge, the offices, and the miscellaneous area of each Ross store.

493228.3

(except an emergency) during the night," and if a worker tries to leave before a Ross employee arrived in the morning, then "a silent alarm will sound and police will be called."[6]

**Subcontractor Agreement**

43.     When engaging the Subs that that will provide the agreed-upon services to meet Ross's janitorial needs, USM requires the Subs to sign a standard Subcontractor Agreement, a form contract drafted by USM, which has remained the same in all parts material to Labor Code § 2810 since at least 2008.

44.     Attached as Exhibit A is the Subcontractor Agreement, executed on July 17, 2008, between USM and Sub Cleanmex, which contracted with USM to provide janitorial services to over 10 Ross Dress for Less and dd's DISCOUNTS stores throughout the Bay Area.

45.     Attached as Exhibit B is the Subcontractor Agreement, executed on April 30, 2009, between USM and RC Maintenance, the now-dissolved Sub that hired Plaintiff Domingo.

46.     Attached as Exhibit C are the "materials related to your service as a USM, Inc ("USM") contractor," including a blank Subcontractor Agreement, which USM has been providing to the Subs it engages since at least 2012.

47.     In all three agreements, the contracting parties are listed as USM, Inc., with an address of 1880 Markley Street, Norristown, Pennsylvania, 19401, and the Sub.

48.     On information and belief, these three contracts, which are identical in all parts material to Labor Code § 2810, reflect the Subcontractor Agreements between USM and all the Subs it has engaged since 2008 for the provision of janitorial services at Ross Dress for Less and dd's DISCOUNTS stores throughout California.

49.     In these Agreements, USM requires its Subs to assume all costs associated with overhead, equipment and other materials, mandating:

> [Y]ou are required to furnish at your own expense all supervision, labor, equipment, materials, and supplies to provide the Services.  You agree to

---

[6] The forms developed by USM and Ross included the "Overnight Service Vendor Responsibilities Checklist," a "Scrub-and-Recoat" explanation sheet, a "Wet Work Scope of Work" instruction sheet, a "Wet Work: Overnight Spot Strip Vendor Responsibilities Checklist," a "Wet Work: Scrub and Recoat Vendor Responsibilities Checklist."

493228.3

use materials, products, and equipment approved by our customer(s) for the Services, and you agree to keep such equipment in satisfactory condition and in safe-working order.

(Exhibit A at 1; Exhibit B at 1; Exhibit C at 3.)

50. USM also instructs the Subs to obtain and pay for Workers' Compensation and liability insurance:

> Prior to the commencement of the Services, you shall obtain and maintain or cause to be obtained and maintained the following insurance, in amounts not less than those specified below: (1) Workers' Compensation . . . (2) Employer's Liability insurance in an amount not less than $100,000 each accident, $100,000 each disease, $200,000 in the aggregate for each statute in which your employees engage in Services under this Agreement. (3) Comprehensive General Liability (CGL) on ISO Form CG 00 01 12 04 with limits of liability of not less than: (i) Each Occurrence: $1,000,000 (ii) Each offense $1,000,000 (iii) General aggregate $2,000,000 (iv) Product-Completed Operates Aggregate $3,000,000 (v) Fire Damages (any one person) $50,000 (vi) Medical Expense (any one person) $5,000 . . . . (4) Comprehensive Automobile Liability . . .

(Exhibit A at 2-3; Exhibit B at 2-3; Exhibit C at 4-5.)

51. In the Subcontractor Agreement, USM establishes that (1) it will supply the Subs with future "schedules" that will specify the stores to be cleaned, the services to be provided, the hours of labor required, and the commission to be paid; and (2) after completing the required services each day, the workers must have their store supervisors sign off on their "work orders," daily, weekly or monthly catalogues of the janitor's performance that the Subs must submit to USM once completed in order to be paid. Specifically, the Agreements provide:

> We will set forth the specifications and pricing on one or more schedules to this Agreement, which you must sign and return prior to commencing any Services. Additionally . . . we will provide you with a work order that must be signed by our customer following completion of Service (a "Work Order"). You must perform all the Services per the specifications and to our customer's satisfaction. You will perform the Services on the days and during the hours specified by our customer(s). . . . You will comply with all procedures specified by us and our customers in performing the Services.

(Exhibit A at 1; Exhibit B at 1; Exhibit C at 3.)

52. USM provides the Subs will get paid only after receiving completed Worker Orders:

> On the last day of each month, you must submit all Work Order(s) signed by our customer's authorized representatives during the month,

11

COMPLAINT

493228.3

together with an invoice reconciling that month's activity for each customer. . . . Your timely submission of an invoice is a condition precedent to our obligation to pay you. Subject to the terms of this Section , we shall send your payment 30 days after the date that we receive and process your invoice. . . .

53.     At the same time, USM reserves the right to pay less than the amount promised in the Schedules if the Sub does not satisfy several obligations:

> We will make payment to you as long as (i) we have received you invoice within 120 days from the last day of the month that you provided the Services; (ii) we have received all properly executed Work Orders and other schedules; (iii) we have received your insurance certifications evidencing the requisite coverage; and (iv) our customer is satisfied. . . .

(Exhibit A at 1; Exhibit B at 1; Exhibit C at 3.)

54.     USM further asserts that it does not have to pay for work that a retail store does not deem satisfactory in any way and for any reason:

> You will immediately correct, without additional charge[,] any Service that does not meet the specifications, and we may deduct up to the full amount due to you for any Service that you do not correct. You further will replace any crew or individual employee upon the request of our customer and that you will do so within 24 hours of receiving notice from us of the customer's request.

(Exhibit A at 1; Exhibit B at 1; Exhibit C at 3.)

55.     USM establishes that it will discount the payment further if a Sub requests timely reimbursement or provides consistent services:

> At your request we may, but are not obligated to pay you all or a portion of the amount invoiced prior to the expiration of the Payment Period ("Rapid Payment"). In consideration of the Rapid Payment, we may discount the amount advanced to you by up to 5%. . . . If your business with us grows to the level that we have paid you at least $10,000 in any twelve month period, then we may automatically discount payments to you by 4% of the total amount of your invoice.

(Exhibit A at 1; Exhibit B at 1; Exhibit C at 3.)

56.     Finally, USM absolves itself of any obligation to pay the Sub if USM does not get paid by the Retailer:

> We are not obligated to pay you until we receive payment from our customer for the Services that you provide.

493228.3

1   (Exhibit A at 1; Exhibit B at 1; Exhibit C at 3.)

2   **Schedules**

3       57.     On information and belief, the Schedules that USM provided to Sub Cleanmex, which

4   were signed in or around October 2008 regarding the provision of janitorial services for approximately

5   3 dd's DISCOUNTS and 8 Ross Dress for Less stores in Alameda and surrounding counties, are

6   illustrative of the Schedules USM imposes on its Subs.

7       58.     Attached as Exhibit D, these Schedules mandate that Cleanmex assign two people to

8   each store for (1) three hours of routine cleaning seven days a week and (2) approximately 12.5 hours

9   of overnight floor buffing once a month. Thus, in total, USM required approximately 205 hours of

10   labor per store per month. Per the schedules, USM would pay Cleanmex $1,200 per month per store.

11       59.     Compensation of $1,200 per month for both workers, who have labored a total of 205

12   hours in the month, breaks down to $5.85 per hour—significantly less than the $8.00 minimum wage

13   that has been in effect in California since January 1, 2008.

14       60.     Nonetheless, under the Subcontracting Agreement, Cleanmex had to extend these

15   insufficient funds to cover not just employee wages but also insurance, equipment and supplies,

16   payroll, overhead and other costs.

17       61.     Thus, even without considering the discounted amounts that USM ultimately paid for

18   the services performed under the Subcontractor Agreement, USM and Ross imposed a funding

19   arrangement on Cleanmex that was insufficient "to allow the [Sub] to comply with all applicable local,

20   state, and federal laws or regulations governing the labor or services to be provided," in violation of

21   Labor Code § 2810.

22       62.     On information and belief, the Schedules that USM provides the Subs that it engages to

23   clean Ross Dress for Less and dd's DISCOUNTS stores throughout California are regularly

24   insufficient to cover (a) regular and overtime wages workers earn performing the janitorial services

25   that the Schedules require; (b) worker's compensation and other employee benefits; (c) the costs of

26   purchasing and maintaining cleaning supplies and equipment; (d) multiple insurance policy premiums;

27   (e) business supplies; (f) wages and benefits for business office employees; (g) costs associated with

28

493228.3

maintaining the records and providing the wage statements required by the California Labor Code;

(h) overhead costs; (i) taxes; and (g) other standard expenses incurred by small janitorial businesses, in

violation Labor Code § 2810.

**Provision of Services, Work Orders, and Discounted Payment**

63.     While at the stores they are assigned to clean, janitorial workers are regularly required to identify themselves as USM vendors.  For example, Plaintiff Domingo was instructed to wear a badge captioned with a logo that identified him as affiliated with "USM An EMCOR Company."

64.     Using various different supervision mechanisms, USM and Ross monitor the workers to ensure that they satisfactorily provide all required services.

65.     First, they require that the workers document their arrival and departure through a phone message service.  For instance, New Generation instructed Plaintiff F. Vilchiz and Plaintiff J. Vilchez to call a specific number using the Ross Dress for Less store's phone upon arriving at work and leave a message with their name, hour of arrival, and city and name of the store.  Likewise, New Generation told them to call the same number upon departing the store and leave a message with their name, hour of departure, name and city of store, and information about any problems with the equipment.  On information and belief, USM mandated that New Generation provide these instructions to its janitorial workers.

66.     Second, as forecasted in the Subcontractor Agreements, USM and Ross design "Work Orders," which articulate the specific tasks that must be completed and how often they must be done.  USM and Ross provide these Work Orders to the Subs, who then distribute them to the workers.  Illustrative of the Work Orders that USM and Ross required the Subs to provide the workers are the "Daily Janitorial Service Sign-Off Sheets" and "Periodic Janitorial Service Sign-Off Sheets" that New Generation distributed to Plaintiffs F. Vilchiz and J. Vilchez for their work at the Livermore Ross Store in September 2012, attached as Exhibit E.

67.     Third, USM and Ross require that Ross Dress for Less and dd's DISCOUNTS store managers sign off on the Work Orders each day, memorializing what services were performed, when the workers arrived and departed, and whether there were problems.

68.     Fourth, as USM warns in its Subcontractor Agreements, it refuses to provide payment for completed services until receiving "properly executed Work Orders."

69.     On information and belief, through the creation and review of these Work Orders and other information it obtained from Ross and the Subs, USM knew or should have known that the scope of services required regularly could not be completed within the timeframes outlined in the Schedules, forcing the janitors to work even more hours than provided for in the Schedules.

70.     On information and belief, through the creation and review of these Work Orders and its daily supervision of the workers, Ross knew or should have known how many hours of labors and what equipment were necessary to enable fulfillment of the services its requested.

71.     In addition, Carlos Rivera, the owner of RC Maintenance, has reported that USM regularly invoked the discount provisions of the Subcontractor Agreement and paid significantly less than the amount promised under the Schedules he signed with USM.  On information and belief, USM often invoked its discount provisions with all of the Subs it engaged to provide janitorial services to Ross Dress for Less and dd's DISCOUNTS stores throughout California.

72.     On information and belief, USM regularly paid the Subs that it contracted with to provide janitorial services at Ross and or dd's DISCOUNTS stores in California less than the amounts outlined in the Schedules.

**Plaintiff Domingo**

73.     In or around October 2010, RC Maintenance hired Plaintiff Domingo to provide janitorial services to several retail stores throughout Alameda County and Marin County in connection with the performance of a Subcontractor Agreement with USM.

74.     Through approximately January 2012, Plaintiff Domingo cleaned a variety of stores, but he dedicated most of his time to Ross Dress for Less and PETCO stores.

75.     While his schedule varied, he regularly provided basic cleaning services for his assigned Ross Dress for Less store(s) approximately three hours per day, several days per weeks, either before or after the stores opened.  In addition, approximately two times per month, he did overnight floor buffering at his assigned Ross Dress for Less store(s) for approximately ten hours per night.

76. RC Maintenance instructed him to wear a name badge with the "USM an EMCOR Company" logo. On information and belief, USM either provided this badge or instructed RC Maintenance to design it.

77. RC Maintenance contracted with Plaintiff Domingo to pay him $8 per hour on a bimonthly basis. When he was paid, Plaintiff Domingo received a payroll check from RC Maintenance for a half-month of work. These checks were often received weeks after the work was completed and they often reflected fewer hours that Plaintiff Domingo had worked.

78. Plaintiff Domingo was regularly deprived of minimum, overtime, and regular wages.

79. Approximately five times before December 2011, RC Maintenance gave Plaintiff Domingo a payroll check that Plaintiff Domingo could not cash because there were insufficient funds in RC Maintenance's bank account. These checks include one dated November 30, 2011, in the amount of $494.59 for Plaintiff Domingo's work the first half of November and one dated November 4, 2011, in the amount of $572 for Plaintiff Domingo's work during the second half of September.

80. Plaintiff Domingo never received any cash or check for the work he performed from mid-November 2011 through his last day of work in early January 2012.

81. When Plaintiff Domingo asked why he had not received the wages he had earned, RC Maintenance's owner Carlos Rivera explained that USM had not provided him with enough money to run his business and pay his workers.

82. Mr. Rivera reports that, around November 2011, USM informed Mr. Rivera that the company would not pay any money it owed RC Maintenance for services rendered until RC Maintenance resolved a separate wage claim that a previous RC Maintenance employee had filed with the California Labor Commissioner against RC Maintenance, USM, and Michaels Stores.

83. Plaintiff Domingo resigned on or around January 7, 2012. In or around June 2012, Plaintiff Domingo sent a demand letter to RC Maintenance requesting his unpaid wages and other damages and penalties to which he was entitled under the California Labor Code.

84. However, by that time, RC Maintenance had gone out of business. According to Mr. Rivera, USM destroyed his business by underpaying him for the services he had provided.

493228.3

**Plaintiffs F. Vilchiz and J. Vilchez**

85.   On or around February 25, 2012, New Generation, an unregistered Alameda County based janitorial Sub, hired Plaintiff F. Vilchiz to clean Ross Dress for Less store #264, located at 4408 Las Positas Road in Livermore, California.  New Generation agreed to pay Plaintiff F. Vilchiz a monthly lump sum of $625 for 2-3 hours of janitorial work in the morning before the Livermore Ross Dress for Less store opened, seven days a week.

86.   New Generation instructed Plaintiff F. Vilchiz that, each day, he must call and leave a message at a specified phone number upon arriving at and leaving from work and must get the Ross Dress for Less store manager to sign his "Daily Janitorial Service Sign-Off Sheet."

87.   Plaintiff F. Vilchiz worked for a month and, at its end, received no compensation.  His New Generation manager told him that the company needed to keep his first month's wages as a "deposit."  Plaintiff F. Vilchiz never received this money.

88.   Despite his initial month of unpaid work, Plaintiff F. Vilchiz continued working for New Generation.  For the rest of the year, he received $625 in cash or by check at the end of each month.

89.   On or around May 30, 2012, New Generation hired Plaintiff J. Vilchez.  Again, New Generation agreed to pay $625 per month for 2-3 hours of work per day, seven days per week.

90.   Like Plaintiff F. Vilchiz, Plaintiff J. Vilchez received no compensation for his first month of work, which New Generation kept as a "deposit."  For the rest of the year, he too received $625 in cash or by check at each month's end.

91.   The checks that Plaintiffs F. Vilchiz and J. Vilchez received from New Generation did not reflect the hours they had worked.

92.   As instructed, each day, Plaintiffs F. Vilchiz and J. Vilchez had a Ross Dress for Less store Manager or Assistant Store Manager initial their Daily Janitorial Service Sign-Off Sheet, which provided a place for the manager to indicate whether two men were present and whether they had completed all required tasks on/in the sales floor, the customer service area, the restrooms, the fitting rooms, the exterior of the store, the lounge, the offices, the door glass, and the mirrors.

493228.3

93. In addition, both men had a Ross Dress For Less store manager initial their monthly "Periodic Janitorial Service Sign-Off Sheet" whenever they had completed one of their required additional tasks.

94. At the end of each month, Plaintiffs F. Vilchiz and J. Vilchez provided their completed Daily Janitorial Service Sign-Off Sheets and Periodic Janitorial Service Sign-Off Sheets to New Generation. On information and belief, as required by their Subcontractor Agreement, New Generation regularly submitted copies of these signed "Work Orders" to USM.

95. After Plaintiffs F. Vilchiz and J. Vilchez completed their work in September 2012, New Generation informed them that the company did not have the money to pay for their previous month's work. The men resigned in or around early October.

96. On information and belief, soon thereafter, New Generation went out of business.

## CLASS ACTION ALLEGATIONS

97. This action is maintainable as a class action pursuant to California Code of Civil Procedure § 382 as to claims under Labor Code § 2810 and the UCL (Cal. Bus. & Prof. Code §§ 17200-17208) that Ross knows or should know that the agreement(s) into which it enters with USM for the provision of janitorial services at Ross Dress for Less and dd's DISCOUNTS stores throughout California provide insufficient funds to enable USM to comply with all applicable local, state, and federal law and regulations governing the janitorial services to be provided. In turn, USM knows or should know that the subcontractor agreements into which it enters with the Subs for the provision of janitorial services at Ross Dress for Less and dd's DISCOUNTS stores throughout California provide insufficient funds to enable the Subs to comply with all applicable local, state, and federal law and regulations governing the janitorial services to be provided.

98. Plaintiffs are representative of other janitorial workers who cleaned Ross Dress for Less and/or dd's DISCOUNTS stores in connection with the performance of subcontractor agreements with USM and are acting on behalf of their interests. The similarly situated employees are readily identifiable and locatable through USM's, Ross's, and the Subs' records. The Class that Plaintiffs seek to represent is defined as follows:

18
COMPLAINT

493228.3

> All persons who were employed by a Sub to clean a Ross Dress for Less and/or dd's DISCOUNTS store in California in connection with the performance of a subcontractor agreement with USM at any time from four years prior to the date of filing of this action through the date of trial.

During the Class Period, Class Members worked for Subs as janitorial workers cleaning Ross Dress for Less and/or dd's DISCOUNTS stores in connection with the performance of (a) agreement(s) between Ross and USM, which Ross knew or should have known did not provide sufficient funds to enable USM to comply with all applicable local, state, and federal law and regulations governing the janitorial services to be provided; and (b) subcontractor agreements between USM and Subs that USM knew or should have known did not provide sufficient funds to enable the Subs to comply to comply with all applicable local, state, and federal law and regulations governing the janitorial services to be provided.

99.     While cleaning Ross Dress for Less and/or dd's DISCOUNTS stores in connection with the performance of subcontractor agreements with USM, Plaintiffs and Class Members were not paid for all of the hours they worked at the minimum wage, as required by I.W.C. Wage Order No. 5 § 4, and Labor Code §§ 219, 221, 222, 223, 224, 1182.12, 1194, 1197, 1197.1, *et seq.* and/or in violation of the UCL (Cal. Bus. & Prof. Code §§ 17200-17208); were encouraged, suffered, permitted, and/or required to work in excess of forty (40) hours per week and/or eight (8) hours per day and/or on a seventh consecutive day without being paid proper overtime compensation, as required by Wage Order No. 5 § 3 and California Labor Code §§ 510, 1194, and/or in violation of the UCL (Cal. Bus. & Prof. Code §§ 17200-17208); were not paid their agreed-upon hourly wage for each hour worked, as required by Labor Code §§ 221-23 and their contracts with the Subs, and/or in violation of the UCL (Cal. Bus. & Prof. Code §§ 17200-17208); were not provided meal periods of at least one half hour after every five hours worked in a day in violation of California Labor Code §§ 226.7, 512, and Wage Order 5 § 11, and/or in violation of the UCL (Cal. Bus. & Prof. Code §§ 17200-17208); were not timely paid their total accrued compensation at time of termination of employment, in violation of California Labor Code §§ 201-203, and/or in violation of the UCL (Cal. Bus. & Prof. Code §§ 17200-17208); and were denied an itemized statement of total hours worked with each payment of wages, as

493228.3

1  required by California Labor Code § 226, and/or in violation of the UCL (Cal. Bus. & Prof. Code

2  §§ 17200-17208).  Plaintiffs are members of the class they seek to represent.

3  **Numerosity of Class**

4      100.    The potential members of the class as defined are so numerous that joinder of all Class

5  Members is impracticable.  Although the precise number of such employees is unknown, Plaintiffs

6  believe that there are at least 40 class members.  The exact number is easily ascertained from USM's,

7  Ross's, and the Subs' records, which are presently within the control of USM, Ross, and the Subs.

8  **Existence and Predominance of Common Questions of Fact and Law**

9      101.    There are questions of law and fact common to the class that predominate over any

10  questions affecting only individual members of the class, including without limitation, whether, as

11  alleged herein, (a) Ross has entered into a contract or agreement for the provision of labor or services

12  at a Ross Dress for Less and/or dd's DISCOUNTS store in California with a janitorial contractor,

13  where Ross knew or should have known that the contract or agreement did not include funds sufficient

14  to allow the contractor to comply with all applicable local, state, and federal law and regulations

15  governing the janitorial services to be provided and (b) USM has entered into a contract or agreement

16  for the provision of labor or services at a Ross Dress for Less and/or dd's DISCOUNTS store in

17  California with a janitorial contractor, where USM knew or should have known that the contract or

18  agreement did not include funds sufficient to allow the contractor to comply with all applicable local,

19  state, and federal law and regulations governing the janitorial services to be provided.

20  **Typicality**

21      102.    The claims of the Plaintiffs are typical of the claims of the class they seek to represent.

22  Plaintiffs and Class Members have worked for Subs cleaning Ross Dress for Less and/or dd's

23  DISCOUNTS stores in connection with the performance of (a) agreement(s) between Ross and USM,

24  which Ross knew or should have known did not provide sufficient funds to enable USM to comply

25  with all applicable local, state, and federal law and regulations governing the janitorial services to be

26  provided; and (b) subcontractor agreements between Subs and USM that USM and/or Ross knew or

27

28

493228.3

1  should have known did not provide sufficient funds to allow the Subs to comply with all applicable

2  local, state, and federal law and regulations governing the janitorial services to be provided.

3      103.    Plaintiffs and Class Members have the same rights under the California Labor Code to

4  be paid for all hours worked and to receive breaks and wage statements that comply with the law.

5  Plaintiffs and all Class Members were subjected to the same violations of their rights under California

6  law by USM and Ross and have suffered damages, including unpaid wages, resulting from USM's and

7  Ross's wrongful conduct.  In addition, Plaintiffs and the Class Members are entitled to injunctive and

8  ·equitable relief, as permitted by law, because USM's and Ross's violations of state statutes have

9  harmed the Class Members and constitute an unfair business practice, especially when compared to

10  those competitors who comply with the law by providing sufficient funds when subcontracting for

11  janitorial services to allow the subcontractor to comply with all applicable local, state, and federal laws

12  or regulations governing the labor or services to be provided.

13  **Adequacy of Representation**

14      104.    Class Representatives Plaintiffs Domingo, J. Vilchez, and F. Vilchiz will fairly and

15  adequately represent and protect the interests of the Class Members.  Plaintiffs' interests are not in

16  conflict with those of the Class Members.  Plaintiffs' counsel are competent and experienced in

17  litigating large employment class actions and other complex litigation matters.

18  **Superiority of Class Action**

19      105.    A class action is superior to other available means for the fair and efficient adjudication

20  of this controversy.  Each Class Member has been damaged and is entitled to recovery because

21  (a) Ross knows or should know that it has entered into agreements for labor or services at Ross Dress

22  for Less and/or dd's DISCOUNTS stores with prime janitorial contractor USM that do not provide

23  sufficient funds to allow USM to comply with all applicable local, state, and federal law and

24  regulations governing the janitorial services to be provided; and (b) USM and/or Ross know or should

25  know that USM has entered into agreements for labor or services at Ross Dress for Less and/or dd's

26  DISCOUNTS stores with Subs that do not provide sufficient funds to allow the Subs to comply with

27  all applicable local, state, and federal law and regulations governing the janitorial services to be

28

21

493228.3

provided. The damages suffered by individual Class Members are small compared to the expense and burden of individual prosecution of this litigation. Individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit against USM and Ross to recover damages stemming from USM's and Ross's unlawful subcontracting practices. In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about the legality of Ross's and USM's janitorial contracting practices.

**FIRST CAUSE OF ACTION**
**Labor Code § 2810**

106. Plaintiffs re-allege and incorporate all paragraphs above as though fully set forth herein.

107. Ross entered into contract(s) or agreement(s) for labor or services with prime contractor USM for the provision of janitorial services at Ross Dress for Less and dd's DISCOUNTS stores throughout California through USM's network of Subs. Ross knew or should have known that the contract(s) or agreement (s) did not include sufficient funds to allow USM to comply with all applicable local, state, and federal laws or regulations governing the labor or services to be provided.

108. On information and belief, the agreement(s) between Ross and USM do not satisfy all the requirements of Labor Code § 2810(d).

109. In connection with the performance of its contract(s) and agreement(s) with Ross, USM contracted with the Subs to perform janitorial services at Ross Dress for Less and/or dd's DISCOUNTS stores throughout California. On information and belief, USM entered into these subcontractor agreements knowing that they did not include sufficient funds to allow the Subs to comply with all applicable local, state, and federal laws or regulations governing the janitorial services provided. In the alternative, USM should have known when it entered into these subcontractor agreements that the subcontractor agreements did not include sufficient funds to allow the Subs to comply with all applicable local, state, and federal laws or regulations governing the janitorial services provided.

110. The subcontractor agreements between USM and the Subs do not satisfy all the requirements of Labor Code § 2810(d).

493228.3

111.    On information and belief, given the compensation that Ross was providing to USM, Ross knew or should have known that, in order to fulfill its obligations under its contract(s) with Ross, USM entered into agreements with Subs that did not include sufficient funds to allow the Subs to comply with all applicable laws and regulations governing the janitorial services provided.

112.    Plaintiffs and the Class Members have been injured as a result of violations of the wage and hour laws and regulations, as set forth herein, in connection with the performance of the services provided for by the insufficiently funded subcontractor agreements between USM and the Subs and between USM and Ross.

113.    Plaintiffs and the Class Members are aggrieved employees as defined in Labor Code § 2810(g) and seek to recover their actual damages or statutory penalties, whichever is greater, and injunctive relief, as alleged herein, as well as costs and reasonable attorney's fees from USM and Ross.

## SECOND CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*

114.    Plaintiffs re-allege and incorporate all paragraphs above as though fully set forth herein.

115.    Based upon information and belief, Ross has engaged in unlawful, unfair and/or fraudulent business acts and practices by entering into contracts or agreements with prime janitorial contractor USM for services or labor to be performed at Ross Dress for Less and/or dd's DISCOUNTS stores where Ross knew or should have known that the agreements did not include funds sufficient for USM to comply with all applicable laws and regulations governing the janitorial services to be provided, in violation of Labor Code § 2810.

116.    Based upon information and belief, USM has engaged in unlawful, unfair and/or fraudulent business acts and practices by entering into contracts or agreements with Subs for services or labor to be performed at Ross Dress for Less and/or dd's DISCOUNTS stores where USM knew or should have known that the agreements did not include funds sufficient for the Subs to comply with all applicable laws and regulations governing the janitorial services to be provided, in violation of Labor Code § 2810.

493228.3

117.    Ross's and USM's unlawful, unfair, and/or fraudulent business acts have caused harm to Plaintiffs.

118.    Plaintiffs are informed and believe that USM and Ross engaged in the same or similar unlawful, unfair, and/or fraudulent business acts against the Class Members described herein and that Ross's and USM's conduct caused harm to the Class Members.

119.    Consequently, USM and Ross are liable to compensate Plaintiffs and the Class Members in restitution and should be enjoined from further violations of Labor Code § 2810.

### THIRD CAUSE OF ACTION
**Violation of the Private Attorneys General Act ("PAGA")**
**[Cal. Labor Code § 2698 *et seq.*]**

120.    Plaintiffs re-allege and incorporate all paragraphs above as though fully set forth herein.

121.    Plaintiffs F. Vilchiz and J. Vilchez ("PAGA Plaintiffs") seek to recover the PAGA civil penalties through a representative action as permitted by PAGA and the California Supreme Court in *Arias v. Superior Court* (2009) 46 Cal. 4th 969.  Therefore, class certification of the PAGA claims is not required, but Plaintiffs may choose to seek certification of the PAGA claims.

122.    Labor Code § 2698 *et seq.* imposes a civil penalty of one hundred dollars ($100) per pay period, per aggrieved employee for the initial violation of Labor Code § 2810 and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

123.    PAGA Plaintiffs will fully comply with the procedural requirements specified in California Labor Code § 2699.3 as to each of the alleged violations.  A true and correct copy of the notice sent via certified mail to the Defendants and California's Labor and Workforce Development Agency is attached as Exhibit F.

124.    Enforcement of statutory provisions to protect workers and to ensure proper and prompt payment of wages is a fundamental public interest.  PAGA Plaintiffs' successful enforcement of important rights affecting the public interest will confer a significant benefit upon the general public.  PAGA Plaintiffs are incurring a financial burden in pursuing this action, and it would be against the interests of justice to require the payment of attorneys' fees and costs from any recovery obtained, pursuant to, *inter alia*, California Labor Code § 2699.

493228.3

125.     As a result of the violations alleged, PAGA Plaintiffs, as aggrieved employees on behalf of themselves and other aggrieved employees, seek all civil penalties available pursuant to California Labor Code § 2699, including all civil penalties, attorneys' fees, expenses, and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seeks the following relief:

1.     Certification of Plaintiffs' claims as a class action, pursuant to California Code of Civil Procedure § 382, on behalf of the proposed class;

2.     Class notice to all janitorial employees who cleaned Ross and/or dd's DISCOUNTS stores in California in connection with the performance of a subcontractor agreement with USM from four years prior to the filing of this Complaint through the trial of this action pursuant to the statute of limitations on the UCL claims, California Business & Professions Code § 17208;

3.     A declaratory judgment that USM has violated Labor Code § 2810 as to Plaintiffs and the Class Members;

4.     Monetary damages, including all unpaid wages and interest thereon;

5.     Restitution for unpaid wages;

6.     Injunctive relief pursuant to Business and Professions Code, sections 17202 and 17203 and Labor Code § 2810;

7.     An award to Class Representative Plaintiffs and the Class Members of reasonable attorneys' fees and costs, pursuant to California Civil Procedure Code § 1021.5, California Labor Code § 2810, and/or other applicable law; and,

8.     An award of such other and further relief as this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury to the extent authorized by law.

Dated: September 5, 2013                    Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

Laura L. Ho

Attorneys for Plaintiffs

25
COMPLAINT

493228.3



**EXHIBIT A**

This Agreement ("Agreement") dated this 17 day of JULY 200 8, is e[ ]ed into between US Maintenance, Inc., ("we" or "us") whose address is 1880 Markley Street, Norristown, Pennsylvania 19401 and CLEAN MEX ("you"), whose address is 1460 HILL AVE MENLO PARK CA 94025

1. Whereas we desire you to provide exterior maintenance services according to the provided specifications (the "Services") to our customer(s) at one or more locations that we designate; and

2. Whereas you are an experienced exterior maintenance company that desires to perform the Services to our customers' satisfaction.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1. Services: We will set forth the specifications and pricing on one or more schedules to this Agreement, which you must sign and return prior to commencing any Services. Additionally, if applicable, we will provide you with a work order that must be signed by our customer following completion of Service (a "Work Order"). You must perform all the Services per the specifications and to our customer's satisfaction. You will perform the Services on the days and during the hours specified by our customer(s). You will provide the day to day management and supervision of the Services performed by your personnel. You specifically understand and agree that neither we nor our customers will supervise any of your employees or any aspects of the Services you provide. In addition, you are required to furnish at your own expense all supervision, labor, equipment, materials, and supplies to provide the Services. You agree to use materials, products, and equipment approved by our customer(s) for the Services, and you agree to keep such equipment in satisfactory condition and in safe-working order. You will immediately correct, without additional charge any Service that does not meet the specifications, and we may deduct up to the full amount due to you for any Service that you do not correct. You further will replace any crew or individual employee upon the request of our customer and that you will do so within 24 hours of receiving notice from us of the customer's request. You will comply with all procedures specified by us and our customers in performing the Services.

2. Billing and Payment Procedures: Your billing procedures will vary by location depending on whether you are paid by event or by season for that location. Pricing for either event or seasonal locations will be provided on separate schedule(s) to this Agreement.

(i) Event Pricing Procedures:
(a) Work Orders. You are required to submit a signed work order (if applicable) and an invoice in order to receive payment **Immediate** submission of signed work orders and invoices should follow every completed Service. Invoices and work orders must be received within 10 days from the date of Service.
(b) Integrated Voice Recognition (IVR). If applicable, you must follow the Work Completion Hotline procedures after you have completed each Service to receive payment.

(ii) Seasonal Pricing Procedures: You are required to submit an invoice to receive payment. You must invoice us for the agreed upon amount that corresponds to each payment period.

Invoices received after the designated time frame may result in a substantial delay in payment. **Any untimely submission of an invoice that prevents us from billing or collecting from our customer will result in no payment for the Services provided.** We will send payment to you 30 days after the date that we receive and process your invoice ("Payment Period") so long as: (i) we receive your invoice; (ii) we receive a signed work order within the designated time frame (if applicable); (iii) you have properly used the Work Completion Hotline procedures after each Service (if applicable); (iv) we have received your insurance certificate demonstrating the required coverage and additional insured language; and (v) we have verified that you have provided Service to our customers satisfaction.

We are not required to take legal action to enforce customer payments. We are not obligated to pay you until we receive payment from our customer for the Services that you provide. You assume the risk of non-payment by our customer for any reason including, without limitation, our customer's bankruptcy, insolvency, reorganization, financial distress, nonperformance, dissatisfaction with services, or any other reason in or out of our control. In no instance may you, your officers, shareholders, employees, contractors, or agents seek to collect payment from our customers.

3. Rapid Payment Program: At your request we may, but are not obligated to pay you all or a portion of the amount invoiced prior to the expiration of the Payment Period ("Rapid Payment"). In consideration of the Rapid Payment, we may discount the amount advanced to you by up to 5%.

4. Automatic Rebate Program: If your business with us grows to the level that we have paid you at least $10,000 in any twelve month period, then we may automatically discount payments to you by 4% of the total amount of your invoice ("Automatic Rebate Program"). You shall not be placed in the Automatic Rebate Program for at least six months from the date that you first begin Services. *Example of Automatic Rebate Program, provided for illustration purpose only: Double A+ Services, Inc. signs a contract and begins Services at one US Maintenance, Inc. customer location in January. Double A+ grows its business with US Maintenance, Inc. and by August has been paid $25,000. In September, Double A+ submits an invoice for $1,000. Because Double A+ has been paid at least $10,000 in a twelve month*

2008 USM subcontractor agreement — 1 — JL Initial

X I Decline the Automatic Rebate Program

*period, and because six months have ___ since Double A+ commenced Services, US M___ ___ce, Inc. may discount payments to Double A+ by 4%. Therefore, the payment t___ ___e A+ on September's $1,000 invoice will be $___*

5.  <u>Compliance with the Law</u>:  In accordance with applicable law, you agree to:

(i) complete an Employment Eligibility Verification Form, also known as a Form I-9, for each person who performs work for you.  The form requires each person who applies to work for you to provide proof of identity and employment eligibility.  The form must be retained for three years after the date of hire, or one year from the date of termination, whichever is later.  A person's employment eligibility must be re-verified if an employee's work authorization is about to expire.

(ii) comply with all federal, state, and local employment and payroll tax, withholding and reporting requirements for all individuals who provide services in connection with this Agreement.

(iii) comply with all applicable provisions of federal, state, and local laws, regulations, and orders affecting safety and health including, without limitation, the Occupational Safety and Health Act.

(iv) comply with all federal, state, and local wage and hour laws, including but not limited to, requirements relating to minimum wage and overtime, meal breaks and rest periods, as well as applicable laws relating to child labor, workers compensation, unemployment insurance, statutory disability, and discrimination.

(v) obtain any licenses or permits required by governmental entities to legally perform your obligations under this Agreement.

During the term of this Agreement, you agree to cooperate fully with us with respect to any request made by us to ensure compliance with all applicable laws.  Without limiting the scope of the foregoing sentence, you agree to permit us, at our request and upon reasonable advance notice, to visit your offices to interview employees and review records for the purpose of verifying compliance with your obligations under this Section.  Attached to this Agreement is a compliance certification survey that you must sign and return to us with the executed Agreement.  From time to time, you may be requested to reconfirm your compliance with applicable laws by executing and returning other certification surveys.  You may also be requested to provide documentation to us to demonstrate your compliance with applicable laws which may include, but not be limited to, a list of your employees who perform Services under this Agreement, as well as Forms I-9, Forms W-2, and payroll stubs or payroll information regarding those employees.  Your failure to cooperate with any of our requests would be grounds for us to terminate this Agreement immediately.

6.  <u>Insurance</u>:  During the term of this Agreement, you must purchase and maintain the insurance coverage specified below.

Concurrently with execution of this Agreement, you shall provide us with certificates of insurance evidencing the insurance required pursuant to this section, together with complete copies of all insurance policies – including all endorsements - required to be carried by you.  All insurance shall be placed with insurance companies acceptable to us licensed to do business in the State where the Services are performed, and include all of the requirements set forth in this section.  All approved subcontractors that you retain under this Agreement shall also be required to obtain and maintain the type of insurance coverage required by this section, with limits approved by us.

Prior to the commencement of the Services, you shall obtain and maintain or cause to be obtained and maintained the following insurance, in amounts not less than those specified below:

(1) Workers' Compensation insurance in accordance with the laws of the State in which your employees engage in Services under this Agreement.  The policy shall contain a Waiver of Subrogation endorsement in favor of us.

(2) Employer's Liability insurance in an amount not less than $100,000 each accident, $100,000 each disease, $200,000 in the aggregate for each state in which your employees engage in Services under this Agreement.

(3) Comprehensive General Liability (CGL) on ISO Form CG 00 01 12 04 with limits of liability of not less than:

| | | |
|---|---|---|
| i. | Each Occurrence: | $1,000,000 |
| ii. | Each Offense | $1,000,000 |
| iii. | General Aggregate | $2,000,000 |
| iv. | Product-Completed Operations Aggregate | $2,000,000 |
| v. | Fire Damage (any one person) | $50,000 |
| vi. | Medical Expense (any one person) | $5,000 |

These amounts are subject to increase as required by our customers

The CGL policy shall contain either by inclusion in the form or by separate endorsement the following coverages:

2008 USM subcontractor agreement                     - 2 -  ___ ___

Initial

- Product-Completed Operations Hazard (to be maintained 2 years beyond completion of the Services);
- Blanket Contractual Coverage (including coverage for the indemnity promises provided under this Agreement);
- Broad Form Property Damage Liability;
- Personal Injury Liability with Employee and contractual exclusion deleted;
- Independent Contractors Liability;
- Waiver of Subrogation in favor of us – ISO Form CG 24 04 11 85 or equivalent;
- The policy shall be endorsed to add as an Additional Insured without restriction and to include coverage for premises, operations, and products-completed operations (to be maintained 2 years beyond completion of the Services) and must include the following language:

    **Section II – Who is An Insured is amended to include as additional insureds US Maintenance, Inc. and its customers and all respective directors, officers, employees, agents, subsidiaries, divisions, affiliates and successors with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused in whole or in part by the acts or omissions of either you or the additional insureds:**

- Other Insurance clause modified so that your policy is **primary and non-contributory** to any of our valid and collectable policies. It is further understood and agreed that any policies maintained by or in our name on our own behalf, or by our customers on their own behalf shall be excess only over any valid and collectible insurance maintained by you on your own behalf and on behalf of us and our customers.

(4) Comprehensive Automobile Liability:

i. Comprehensive form liability covering any auto, including all owned, hired and non-owned autos;
ii. Combined single limit of liability in the amount of $1,000,000;
iii. Shall include contractual liability coverage for indemnity provisions of this Agreement, including injury to your employees;
iv. Policy shall be subject to the same requirements as CGL policy regarding the entities required to be named as Additional Insured, Waiver of Subrogation and Primary and Non-Contributory provision.

All insurance required to be maintained by this provision shall be subject to the following notice provision:

This insurance shall not be cancelled, materially changed or allowed to expire without at least thirty (30) days advance written notice to Us/Additional Insured at the following address:

> US Maintenance, Inc.
> Attn: Compliance Department
> 1880 Markley Street
> Norristown, PA 19401

All insurance policies shall be written on "an occurrence basis." If, however, any policies are written on a "claims made" basis, the retroactive date shall coincide with or precede the date on which you first commenced the Services. You shall ensure that such policies are maintained in full force and effect by you and any authorized subcontractors for at least two (2) consecutive years following completion of the Scope of Work. In the event any such policies of "claims made" insurance are terminated, you shall purchase extended reporting provisions to report claims arising hereunder for a period of at least two (2) years thereafter.

No policies may be canceled or materially revised without our prior written approval. Coverage specified in this section is for minimum amounts only and is not a warranty of the adequacy of such coverage. You must secure and pay all premiums on all insurance coverage required by federal, state, and local law. You must immediately notify us of any injury or claim against you and/or us arising out of your performance of the Services, and provide us with copies of all relevant documents, including but not limited to all summons and complaints asserting such claims. Should your aggregate limits of liability be reduced due to loss from claims, you must reinstate or cause the aggregate limits to be reinstated to the minimum amounts specified in this section.

At our sole discretion, we may require you to obtain additional types of insurance as required by specific accounts. Any additional insurance shall comply with the requirements of this Agreement.

In the event that you fail or neglect to obtain, maintain or renew the required insurance as specified in this section and fail or neglect to furnish evidence thereof to us and provide us with the Certificates of insurance and copies of policies as required hereunder, we shall have: (a) the right, but not the obligation, to procure the above-described insurance and reduce your charges for Services by the cost thereof; or (b) deem your failure or neglect as a material breach of this Contract.

2008 USM subcontractor agreement - 3 - J A

Initial

The required coverage, pre████s, and limitations of this provision shall not ████ liability, and we, at our discretion, may increase the minimum limits of liabili███ those insurance policies that you are required to ██████n during the term of this Agreement.

7.  Independent Contractor; Indemnification:

A.  Independent Contractor.  In the performance of the Services hereunder, you shall be and act as an independent contractor.  Nothing in this Agreement, or in the relationship between you and us, shall be deemed to constitute a partnership, joint venture or other similar relationship, and you agree not to make any contrary assertion, claim or counterclaim in any action, suit or other legal proceeding involving you and us.  You are responsible for all losses, damages, judgments, liabilities, claims, injuries, costs, and expenses arising directly or indirectly from the ownership and operation of your business, your motor vehicles, your property, and your performance of the Services.  You are not authorized to make any promise, agreement, or contract on our behalf, to bind us in any manner, or to hold yourself out as anything but an independent businessperson.  You have full responsibility for all debts and obligations of your business including without limitation all bills, invoices, debts, taxes, payroll, and insurance costs.  It is specifically understood that you will maintain all payroll records for your employees and that we will not do so.  You agree to do business only under your own corporate name as our subcontractor and that you have not been licensed: (i) to use the "US Maintenance" trade mark, (ii) to do business as or under the "US Maintenance" trade mark, (iii) or otherwise offered, sold or provided a franchise or business opportunity.

B.  Defense and Indemnification.  You shall, at your own cost and expense, defend us and our customer and both our and our customer's respective officers, directors, employees, agents, shareholders, partners, joint venturers, affiliates, successors and assigns ("Indemnified Parties") from and against all allegations (even if such allegations may be later proven false, fraudulent or groundless) asserted in any and all claims reasonably related to Services you provided or failed to provide under this Agreement, regardless of whether your indemnity obligations, specified below, ultimately apply and regardless of whether the allegations are directed solely against one or more of the Indemnified Parties.

To the fullest extent permitted by applicable law, you shall indemnify and hold harmless the Indemnified Parties from and against any and all liabilities, obligations, claims, demands, causes of action, losses, expenses, damages, fines, assessments, awards, deficiencies, judgments, settlements, and penalties, including, without limitation, costs, and expenses whatsoever (including without limitation attorneys' consultants' and other professional fees and disbursements)  incident thereto (collectively "Losses"), arising out of, based upon, occasioned by or in connection with:

(1) Your performance of (or failure to perform) your duties under this Agreement;

(2) A violation of any law or any negligence, gross negligence or willful misconduct by you or your affiliates, subcontractors, agents or employees during either your performance of your duties under this Agreement or otherwise while you are on the property of one of our customers;

(3) Damage to property and injuries, including without limitation death, to all persons, arising from any occurrence caused by any act or omission of you or your personnel related to the performance of this Agreement.

(4) Your breach of any of the representations, warranties covenants or obligations contained in this Agreement.

(5) You or your personnel being declared to have "common law" or "employee" status with respect to the Services performed under this Agreement.

(6) Your failure (i) to provide any legally required employee-related benefits applicable to your personnel performing Services under this Agreement, or (ii) to withhold and/or remit all amounts required by applicable law, rule, regulation, or policy, including but not limited to withholdings for Federal Insurance Contributions Act ("FICA"), Federal Unemployment Tax Act ("FUTA"), unemployment insurance, workers compensations insurance, disability, pension, income tax and health insurance purposes.

The indemnification obligation specified in this paragraph 7. B. shall be construed so as to extend to all legal, defense and investigation costs, as well as other costs, expenses, and liabilities incurred by the Indemnified Parties, including but not limited to interest, penalties, and fees of attorneys, consultants, accountants and other professionals (including expenses), from and after the time when any Indemnified Party receives notification (whether verbal or written) that a claim or demand has been made or is to be or may be made.

Pursuant to the indemnification obligation specified in this paragraph 7. B., you agree to indemnify and hold harmless the Indemnified Parties regardless of whether the Losses were caused in whole or in part by the Indemnified Parties' violation of any law or  negligence (excluding gross negligence or willful misconduct), including but not limited to business invitee premises liability.  For the avoidance of doubt, you are obligated to indemnify us under this paragraph 7.B. even if we are negligent in causing the Losses.

C.  Damage Limitation.  In no event shall we be liable for consequential, incidental, or special damages, including without limitation and delay damages, lost opportunity damages or lost profits, incurred by you or your affiliates, subcontractors, agents, or employees in connection with this Agreement.

8.  Personnel:

A.  Employees.  All persons who perform the Services under this Agreement must be your employees, and not your independent contractors.  You will employ only trained, qualified, and responsible personnel, and will enforce strict discipline and good order among your employees.  You will selectively hire only those individuals that can competently and responsibly perform the Services.  You agree that all employees will have received appropriate training with respect to the Services and that the employees are certified or licensed, if necessary, under applicable law.  If required by our customer, then you, at your expense, will perform background checks on any personnel that you intend to employ at any of that customer's locations.

2008 USM subcontractor agreement                                    - 4 -   JA
                                                                            Initial

You are responsible for all employee-related benefits applicable to your employees who perform the Services. You are responsible for withholding the personal portion of ■■■ taxes, and for withholding income taxes for f ●●● of state income tax purposes in the manner required by law. You will, in a timely ■■■er, pay over all amounts withheld to the Internal Rev●●● Service or to the appropriate state authorities as the case may be, an will timely pay its share or all FICA and FUTA taxes for all your employees who perform the Services. We shall not have any responsibility for these employee-related tax items and shall be indemnified and held harmless by you from any liability, cost, or expense, including any interest, penalties, and legal fee, that may be assessed against or incurred by us in connection with your failure to make any such payment.

B. Non-solicitation. You will neither solicit for employment nor hire any of our employees during the terms of this Agreement and for six (6) months following its termination.

9. Customer Confidential Information. When performing services, you may come into contact with personal information about clients of our customers. You agree not to remove, divulge, disclose, or communicate any of this personal information.

10. Confidential Information and Non-Competition Covenant:

A. Confidential Information. You acknowledge that confidential and proprietary business information and trade secrets including without limitation our customer lists, the Services provided and the prices charged for them, our Billing and Payment Procedures, our Work Orders, schedules, contracts, and other forms (hereinafter the "Confidential Information") will become known by you. Since the unauthorized use or disclosure of the Confidential Information will cause irreparable harm to us, you covenant neither to reveal to others nor to use yourself, except as authorized by us in writing, the Confidential Information. You undertake for yourself and all those acting on your behalf to keep and maintain the Confidential Information in strict confidence both during the term of the contract and after its expiration or termination.

B. Non-Competition. During the term of this Agreement and for a period of twenty-four (24) months thereafter, you and your officers, shareholders, and directors agree not to contract, solicit, or do business with any of our customers (or their contractors, assigns or designees) for whom you performed Services under this Agreement, regardless of the location where you performed the Services. IF YOU VIOLATE THIS SECTION 10.B, THEN IN ADDITION TO ANY INJUNCTIVE RELIEF AND ADDITIONAL DAMAGES TO WHICH WE ARE ENTITLED, YOU EXPRESSLY AGREE IMMEDIATELY TO PAY US A MINIMUM AMOUNT OF DAMAGES EQUAL TO SIX (6) TIMES OUR EXPECTED MONTHLY REVENUE FOR EACH LOCATION THAT YOU SERVICE IN VIOLATION OF THIS NON-COMPETITION COVENANT, PLUS ANY LEGAL FEES, COSTS AND EXPENSES INCURRED BY US TO ENFORCE OUR RIGHTS HEREUNDER. You agree that we are entitled to these minimum damages without the necessity of proving actual damages, and that the amount of minimum damages contemplated herein is not a penalty and instead is a reasonable estimate of the damages that we will have sustained due to your violation of this non-competition covenant.

C. Relief. You agree that the provisions set forth in this Section are reasonable and necessary to protect our legitimate interests, and that we never would have entered into this Agreement in the absence of such restrictions. You agree that any violation of this Section shall cause irreparable injury to us and can not be reasonably or adequately compensated in damages. You agree that we are entitled to preliminary and permanent injunctive relief, without the necessity of proving actual damages, as well as an equitable accounting of all earnings and profits in excess of the minimum damages specified above, in addition to any other relief to which we are entitled. These rights are cumulative. You agree to reimburse us for all reasonable costs and attorneys' fees incurred by us for action taken by us under this Section in a timely manner each month as such fees are incurred by us and billed to you.

11. Termination or Cancellation: This Agreement or any schedule to this Agreement may be terminated by either party for any reason upon seven (7) days prior written notice by the terminating party delivered to the non-terminating party. This Agreement or any schedule to this Agreement may be terminated by us, upon one (1) day's notice, if: (i) we or our customer notifies you that your Services are unsatisfactory; (ii) you violate any provision of this Agreement; (iii) you fail to maintain the required insurance, reduce your coverage, or cancel the required insurance without our written consent; (iv) you are unable to perform the Services; (v) you assign this Agreement, become insolvent, or declare bankruptcy; (vi) you subcontract the Services without written authorization from us; (vii) you fail to fully cooperate with us or our customer in any security investigation; or (viii) our customer receiving your Services cancels their contract with us.

12. Arbitration; Waiver of Jury Trial and Punitive Damages; Governing Law and Jurisdiction:

A. Arbitration. All disputes, controversies and claims of any kind arising out of or relating to this Agreement or the rights and obligations of the parties shall be settled through arbitration by the American Arbitration Association at its Philadelphia, Pennsylvania office, in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules. This provision shall survive the termination or expiration of this Agreement. Nothing contained herein shall prevent us from applying to and obtaining from any court having jurisdiction, a temporary or preliminary injunction, and/or other emergency relief to enforce our rights and your obligations under this Agreement prior to the filing of any arbitration proceeding or pending the trial, or rendering of a decision or award pursuant to any arbitration proceeding conducted hereunder.

B. Governing Law and Jurisdiction. THE LAWS OF THE STATE OF PENNSYLVANIA SHALL GOVERN THE VALIDITY, PERFORMANCE, INTERPRETATION, AND EFFECT OF THIS AGREEMENT. IF AN ARBITRATOR DOES NOT HAVE JURISDICTION, A CLAIM CAN NOT BE ARBITRATED AS A MATTER OF LAW, OR IF THERE IS AN APPEAL FROM OR RELATING TO AN ARBITRATION, THEN THE PARTIES AGREE TO THE JURISDICTION AND VENUE OF THE COURTS IN MONTGOMERY COUNTY, PENNSYLVANIA OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN PHILADELPHIA.

C. Waivers. Both you and we irrevocably waive our respective rights to trial by jury on any action, proceeding, or counterclaim, whether at law or in equity, brought by either you or us. Furthermore, both you and we irrevocably waive, to the fullest extent permitted by law, any right or claim for any punitive, exemplary, consequential, or speculative damages against one another. Both you and we agree that in the event of a dispute, except as otherwise provided in this Agreement, each is limited to the actual damages sustained. No arbitration or action under this

Initial

Agreement shall include, by consolidation, joinder, or any other manner, any claims by any person or entity in privity with or claiming through or on behalf either you or us. Neither you nor we shall arbitrate or litigate as a representative on behalf of any other person or entity, any dispute, controversy, or claim of any kind arising out of or relating to this Agreement, your or our respective rights and obligations, or any other claims or causes of action relating to your or our performance under this Agreement.

13. **Assignment.** We may assign this Agreement without prior notice to you. You may not assign this Agreement.

14. **Right to Offset.** We may withhold from payment owed to you any amount due to us from you under the indemnification provision, any other provision of this Agreement, or due to a breach of this Agreement.

15. **Miscellaneous.** If any sentence, paragraph or provision in this Agreement for any reason is deemed illegal or otherwise unenforceable, then the validity of the remaining sentences, paragraphs or provisions shall not be affected; the unenforceable portion, term or provision shall be deemed not to be a part of this Agreement, and this Agreement shall be construed as if such provision had never been a part of it. Any provisions of this Agreement that may be reasonably interpreted to impose any obligation after termination or expiration upon you or us shall survive such termination or expiration and be binding upon you and us. This Agreement contains the entire agreement between you and us. No promises, inducements or representations not contained in this Agreement shall be of any force or effect or binding upon you or us. Any pre-printed terms or conditions appear on an invoice from you shall be of no force and effect, and shall be expressly superseded by the terms of this Agreement. Any modifications, changes, or variances to this Agreement made by you shall be void and of no effect unless made in writing and signed by us.

Intending to be legally bound, the parties hereto have caused this Agreement to be executed by their authorized representatives on the date first above written.

**You:** CLEANMEX
Print complete business name. Indicate a fictitious name with "d/b/a"

Signature _Juan Aguilar_

JUAN AGUILAR
Print Name

OWNER
Title

**Us:** **US Maintenance, Inc.**

Signature _____

Print Name _____

Title _____



**EXHIBIT  B**

## SUBCONTRACTOR AGREEMENT

This Agreement ("Agreement"), dated this 30 day of April 2009, is entered into between USM, Inc. ("we" or "us") whose address is 1880 Markley Street, Norristown, Pennsylvania 19401 and RC Maintenance Inc. ("you"), whose address is 3235 MacArthur Blvd Oaklan CA 94602.

    1.   Whereas we desire you to provide interior maintenance services according to the provided specifications (the "Services") to our customer(s) at one or more locations that we designate; and

    2.   Whereas you are an experienced interior maintenance company that desires to perform the Services to our customers' satisfaction.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    Services: We will set forth the specifications and pricing on one or more schedules to this Agreement, which you must sign and return prior to commencing any Services. Additionally, if applicable, we will provide you with a work order that must be signed by our customer following completion of Service (a "Work Order"). You must perform all the Services per the specifications and to our customer's satisfaction. You will perform the Services on the days and during the hours specified by our customer(s). You will provide the day to day management and supervision of the Services performed by your personnel. You specifically understand and agree that neither we nor our customers will supervise any of your employees or any aspects of the Services you provide. In addition, you are required to furnish at your own expense all supervision, labor, equipment, materials, and supplies to provide the Services. You agree to use materials, products, and equipment approved by our customer(s) for the Services, and you agree to keep such equipment in satisfactory condition and in safe-working order. You will immediately correct, without additional charge any Service that does not meet the specifications, and we may deduct up to the full amount due to you for any Service that you do not correct. You further will replace any crew or individual employee upon the request of our customer and that you will do so within 24 hours of receiving notice from us of the customer's request. You will comply with all procedures specified by us and our customers in performing the Services.

2.    Billing and Payment Procedures: On the last day of each month, you must submit all Work Order(s) signed by our customer's authorized representatives during the month, together with an invoice reconciling that month's activity for each customer. We must receive your invoice within 120 days from the last day of the month that you provided the Services. If we do not receive an invoice within 120 days from the last day of the month that you provided a service, then you have not completed your performance of that service and we are not obligated to pay you for that service. Your timely submission of an invoice is a condition precedent to our obligation to pay you. Subject to the terms of this Section 2, we shall send your payment 30 days after the date that we receive and process your invoice ("Payment Period"). You may not invoice us earlier than the last day of the month during which you performed service. If we have made any advances to you, then we shall deduct the advanced amount from your payment. We will make payment to you as long as: (i) we have received your invoice within 120 days from the last day of the month that you provided the Services; (ii) we have received all properly executed Work Orders and other schedules; (iii) we have received your insurance certificates evidencing the requisite coverage; and (iv) our customer is satisfied.

    We are not required to take legal action to enforce customer payments. We are not obligated to pay you until we receive payment from our customer for the Services that you provide. You assume the risk of non-payment by our customer for any reason including, without limitation, our customer's bankruptcy, insolvency, reorganization, financial distress, nonperformance, dissatisfaction with services, or any other reason in or out of our control. In no instance may you, your officers, shareholders, employees, contractors, or agents seek to collect payment from our customers.

3.    Rapid Payment Program: At your request we may, but are not obligated to pay you all or a portion of the amount invoiced prior to the expiration of the Payment Period ("Rapid Payment"). In consideration of the Rapid Payment, we may discount the amount advanced to you by up to 5%.

4.    Automatic Rebate Program: If your business with us grows to the level that we have paid you at least $10,000 in any twelve month period, then we may automatically discount payments to you by 4% of the total amount of your invoice ("Automatic Rebate Program"). You shall not be placed in the Automatic Rebate Program for at least six months from the date that you first begin Services. *Example of Automatic Rebate Program, provided for illustration purpose only: Double A+ Services, Inc. signs a contract and begins Services at one USM customer location in January. Double A+ grows its business with USM and by August has been paid $25,000. In September, Double A+ submits an invoice for $1,000. Because Double A+ has been paid at least $10,000 in a twelve month period, and because six months have passed since Double A+ commenced Services, USM may discount payments to Double A+ by 4%. Therefore, the payment to Double A+ on September's $1,000 invoice will be $960.*   2% Approved By Vice President - Shirley Colman

5.    Compliance with the Law: In accordance with applicable law, you agree to:

    (i) complete an Employment Eligibility Verification Form, also known as a Form I-9, for each person who performs work for you. The form requires each person who applies to work for you to provide proof of identity and employment eligibility. The form must be retained for three years after the date of hire, or one year from the date of termination, whichever is later. A person's employment eligibility must be re-verified if an employee's work authorization is about to expire.

2008 interior maintenance subcontractor agreement

      - 1 -

CR
Initial

(ii) comply with all federal, state, and local employment and payroll tax, withh      g and reporting requirements for all individuals who provide services in connection with this Agreement.

(iii) comply with all applicable provisions of federal, state, and local laws, regulations, and orders affecting safety and health including, without limitation, the Occupational Safety and Health Act.

(iv) comply with all federal, state, and local wage and hour laws, including but not limited to, requirements relating to minimum wage and overtime, meal breaks and rest periods, as well as applicable laws relating to child labor, workers compensation, unemployment insurance, statutory disability, and discrimination.

(v) obtain any licenses or permits required by governmental entities to legally perform your obligations under this Agreement.

During the term of this Agreement, you agree to cooperate fully with us with respect to any request made by us to ensure compliance with all applicable laws. Without limiting the scope of the foregoing sentence, you agree to permit us, at our request and upon reasonable advance notice, to visit your offices to interview employees and review records for the purpose of verifying compliance with your obligations under this Section. Attached to this Agreement is a compliance certification survey that you must sign and return to us with the executed Agreement. From time to time, you may be requested to reconfirm your compliance with applicable laws by executing and returning other certification surveys. You may also be requested to provide documentation to us to demonstrate your compliance with applicable laws which may include, but not be limited to, a list of your employees who perform Services under this Agreement, signed consumer authorization forms (when applicable), as well as Forms I-9, Forms W-2, and payroll stubs or payroll information regarding those employees. Your failure to cooperate with any of our requests would be grounds for us to terminate this Agreement immediately.

6.    Insurance: During the term of this Agreement, you must purchase and maintain the insurance coverage specified below.

Concurrently with execution of this Agreement, you shall provide us with certificates of insurance evidencing the insurance required pursuant to this section, together with complete copies of all insurance policies – including all endorsements - required to be carried by you. All insurance shall be placed with insurance companies acceptable to us licensed to do business in the State where the Services are performed, and include all of the requirements set forth in this section. All approved subcontractors that you retain under this Agreement shall also be required to obtain and maintain the type of insurance coverage required by this section, with limits approved by us.

Prior to the commencement of the Services, you shall obtain and maintain or cause to be obtained and maintained the following insurance, in amounts not less than those specified below:

(1)  Workers' Compensation insurance in accordance with the laws of the State in which your employees engage in Services under this Agreement. The policy shall contain a Waiver of Subrogation endorsement in favor of us.

(2)  Employer's Liability insurance in an amount not less than $100,000 each accident, $100,000 each disease, $200,000 in the aggregate for each state in which your employees engage in Services under this Agreement.

(3)  Comprehensive General Liability (CGL) on ISO Form CG 00 01 12 04 with limits of liability of not less than:

| | | |
|---|---|---|
| i. | Each Occurrence: | $1,000,000 |
| ii. | Each Offense | $1,000,000 |
| iii. | General Aggregate | $2,000,000 |
| iv. | Product-Completed Operations Aggregate | $2,000,000 |
| v. | Fire Damage (any one person) | $50,000 |
| vi. | Medical Expense (any one person) | $5,000 |

These amounts are subject to increase as required by our customers

The CGL policy shall contain either by inclusion in the form or by separate endorsement the following coverages:

- Product-Completed Operations Hazard (to be maintained 2 years beyond completion of the Services);
- Blanket Contractual Coverage (including coverage for the indemnity clauses provided under this Agreement);
- Broad Form Property Damage Liability;
- Personal Injury Liability with Employee and contractual exclusion deleted;
- Independent Contractors Liability;
- Waiver of Subrogation in favor of us – ISO Form CG 24 04 11 85 or equivalent;
- The policy shall be endorsed to add us as an Additional Insured without restriction and to include coverage for premises, operations, and products-completed operations (to be maintained 2 years beyond completion of the Services) and must include the following language: